# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
October 27, 2010

Lyle W. Cayce
Clerk

No. 09-70037

WILLIAM WILEY,

Petitioner-Appellee

v.

CHRISTOPHER B EPPS, COMMISSIONER, MISSISSIPPI DEPARTMENT OF CORRECTIONS,

Respondent-Appellant

---

Appeal from the United States District Court
for the Northern District of Mississippi

---

Before KING, JOLLY, and DAVIS, Circuit Judges.

KING, Circuit Judge:

This is a capital case in which the district court granted habeas relief in favor of Petitioner-Appellee William Wiley, holding that Wiley is ineligible for a death sentence because he is mentally retarded as contemplated by *Atkins v. Virginia*, 536 U.S. 304 (2002). The State of Mississippi, acting through Respondent-Appellant Christopher B. Epps, appeals. We conclude that the district court did not clearly err in finding Wiley mentally retarded. We therefore AFFIRM the district court's judgment.

No. 09-70037

## I. Factual and Procedural Background

In 1981, Wiley shot and killed store owner J.B. Turner during the course of a robbery in DeSoto County, Mississippi. He also shot Turner's daughter, leaving her seriously injured and blind. Wiley was charged with capital murder and was convicted in 1982. His conviction was affirmed on direct appeal, but his death sentence was vacated and the case was remanded for a new sentencing hearing because of improper comments that had been made by the prosecutor. *See Wiley v. State*, 449 So. 2d 756, 763 (Miss. 1984). Wiley was again sentenced to death in 1984, and the sentence was upheld on direct appeal. *See Wiley v. State*, 484 So. 2d 339, 355 (Miss. 1986). In a subsequent federal habeas petition, we vacated the death sentence on the ground that the state trial court had improperly instructed the second sentencing jury. *See Wiley v. Puckett*, 969 F.2d 86, 91 (5th Cir. 1992). In 1995, Wiley was sentenced to death for the third time. The sentence was again affirmed on direct appeal, *see Wiley v. State*, 691 So. 2d 959, 960 (Miss. 1997), and Wiley's subsequent efforts for state post-conviction relief were unsuccessful.

Wiley again sought federal habeas relief in a 28 U.S.C. § 2254 petition. In 2003, while his federal petition was pending, Wiley filed in state court a successive habeas application based on the United States Supreme Court's decision in *Atkins*. Wiley claimed that he is mentally retarded and therefore ineligible for a death sentence.

In support of his state habeas application, Wiley relied in part on an affidavit from Dr. David Grant, who administered to Wiley in 2003 the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III). Dr. Grant reported from this test that Wiley's Verbal IQ was 73, his Performance IQ was 68, and his full-scale IQ was 68, placing Wiley within the mentally retarded range for intellectual functioning. Dr. Grant also indicated that Wiley had adaptive behavior deficits in at least two defined areas and that Wiley's mental retardation manifested by

No. 09-70037

age eighteen. In addition to Dr. Grant's testing, Wiley had also been tested in 1987 and 1994 by Dr. Billy Fox, who administered the Wechsler Adult Intelligence Scale-Revised (WAIS-R), an earlier version of the Wechsler test. Dr. Fox's testing had revealed full-scale IQ scores of 73 and 78, respectively. Dr. Fox indicated in a 1987 affidavit that Wiley was borderline mentally retarded. Dr. Grant opined that Wiley's 1987 and 1994 scores were consistent with his 2003 performance, and that Wiley was mildly mentally retarded. In a 2004 affidavit, Dr. Fox also agreed that Wiley's 2003 score on the WAIS-III was consistent with his 1987 and 1994 WAIS-R scores. Dr. Fox explained that the consistency was due to the margin of error for the tests, the Flynn effect, and the practice effect.[1] Wiley also submitted with his state application his school records.

The Mississippi Supreme Court declined to grant Wiley an evidentiary hearing on his *Atkins* claim because it determined that he failed to present a prima facie case. The court examined the record and held that the evidence did not support Wiley's claim. *See Wiley v. State*, 890 So. 2d 892, 897–98 (Miss. 2004). Instead, the court determined that, at best, Wiley's experts had shown only borderline mental retardation. *Id.* at 898. The court placed particular emphasis on several affidavits in the record that had been submitted by Wiley's family and friends as mitigating evidence during the earlier state court proceedings. In the words of the state court, those affidavits indicated that Wiley "was a good husband, father, son and grandson, that he was a good, reliable worker with steady employment at various employers, that he

---

[1] The so-called "Flynn effect" is a phenomenon positing that, over time, standardized IQ test scores tend to increase with the age of the test without a corresponding increase in actual intelligence in the general population. Those who follow the Flynn effect adjust for it by deducting from the IQ score a specified amount for each year since the test was normalized. *See In re Salazar*, 443 F.3d 430, 433 n.1 (5th Cir. 2006). Dr. Fox opined that Wiley's score of 78 on the 1994 WAIS-R reflected thirteen years of inflation since the test was originally standardized and was "unreliably high." The "practice effect" holds that a subject who is tested more than once generally will do better on subsequent tests than on the first test.

3

performed household maintenance, repaired automobiles, babysat children, ran errands, supported his family and did numerous other things." *Id.* at 896. The court discounted Wiley's school records as evidence of retardation because in addition to showing poor performance they also showed a poor attendance record, and there was no indication that Wiley had ever attended special education classes. *Id.* The court noted that Wiley had been in the Army until he injured his leg and was honorably discharged. *Id.* The court further noted that Wiley had not completed a test to rule out malingering. *Id.* at 898. It concluded that the "overwhelming weight of the evidence" showed Wiley was not mentally retarded. *Id.*

Wiley filed a motion for rehearing, submitting a supplemental affidavit from Dr. Grant addressing the Mississippi Supreme Court's opinion. Dr. Grant indicated that the court was incorrect to rely on the affidavits from Wiley's friends and family as proof that Wiley was not mentally retarded. Contrary to the court's holding, Dr. Grant stated that it is widely accepted in the medical community that mentally retarded persons are often able to perform basic life functions and tasks, such as holding jobs, driving cars, and supporting their families. Dr. Grant reiterated his opinion that, to a reasonable degree of psychological certainty, Wiley fell within the mentally retarded range, and the retardation manifested before age eighteen. The state court denied the motion.

Wiley then raised his *Atkins* claim in federal court by amending his § 2254 petition. Wiley claimed that Dr. Grant's affidavits had been sufficient to warrant an evidentiary hearing in state court, and that the Mississippi Supreme Court failed to follow its own precedent and procedures by denying him a hearing. Wiley maintained that the evidence showed he was mentally retarded.

The federal district court initially denied Wiley's *Atkins* claim but subsequently withdrew its decision after Wiley filed a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59. The district court

No. 09-70037

ordered additional briefing and conducted an evidentiary hearing. The court appointed Dr. C. Gerald O'Brien to examine Wiley. Wiley was also examined by his own expert, Dr. Victoria Swanson, and by an expert obtained by the State, Dr. Gilbert S. Macvaugh, III. At the evidentiary hearing, Drs. O'Brien and Swanson both testified that Wiley was mentally retarded, but Dr. Macvaugh reached a contrary conclusion. The district court issued a written opinion in which it first determined that the Mississippi Supreme Court had failed to follow its own precedent for determining whether a defendant should obtain a hearing on an *Atkins* claim, and that the failure to permit a hearing had denied Wiley due process. The district court determined that it was therefore not bound to afford deference to the state court's resolution of Wiley's claim. The district court determined from a preponderance of the evidence that Wiley was mentally retarded. The court held that Wiley was thus entitled to have his death sentence vacated pursuant to *Atkins*.

The State now appeals.[2] It contends that Wiley failed to meet the requirements for an evidentiary hearing in state court, and therefore the federal district court erroneously concluded that the state court denied Wiley due process. Under the State's view, the district court should not have granted Wiley's Rule 59 motion or conducted an evidentiary hearing and should have deferred to the Mississippi Supreme Court's holding that Wiley is not mentally retarded. The State further argues that the district court's conclusion that Wiley is mentally retarded is incorrect because Wiley failed to show in the federal hearing that he has subaverage intellectual ability and adaptive functioning

---

[2] Although the district court's judgment denied Wiley federal habeas relief on numerous additional claims challenging his conviction, Wiley did not file a notice of appeal or seek a Certificate of Appealability (COA) as to those additional claims. *See* 28 U.S.C. § 2253(c)(1); FED. R. APP. P. 22(b)(1). Thus, the only issue before us in the instant appeal is Wiley's *Atkins* claim. Because the State is the appellant on this issue, no COA is required. *See DiLosa v. Cain*, 279 F.3d 259, 262 n.1 (5th Cir. 2002) (citing FED. R. APP. P. 22(b)(3)).

deficits, both of which manifested before the age of eighteen. Before turning to the district court's conclusion on metal retardation, we first set out the standard of review and the requirements under *Atkins*; we then consider the district court's grant of an evidentiary hearing and its determination that no deference was due to the state court.

## II.  Standard of review

In an appeal from the district court's grant of habeas relief, we review issues of law *de novo* and findings of fact for clear error. *Fratta v. Quarterman*, 536 F.3d 485, 499 (5th Cir. 2008). Wiley's habeas petition is governed by the standards of the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, because he filed his *Atkins* claim well after the effective date of the AEDPA. *See Lindh v. Murphy*, 521 U.S. 320, 324–26 (1997). Under those standards, a federal court may not grant a petitioner habeas relief on a claim that was adjudicated on the merits by the state court unless the state court decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Pierce v. Thaler*, 604 F.3d 197, 200 (5th Cir. 2010).

"A state court decision is 'contrary to' clearly established federal law if it applies a rule that contradicts the governing law set forth in Supreme Court cases . . . or if the state court decide[s] a case differently than the United States Supreme Court previously decided a case on a set of nearly identical facts." *Jones v. Cain*, 600 F.3d 527, 535 (5th Cir. 2010) (internal quotation marks and citations omitted). A state court's decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) (internal quotation marks and

No. 09-70037

citations omitted).  An unreasonable application of federal law is different from an incorrect or erroneous application of the law.  *Rogers v. Quarterman*, 555 F.3d 483, 488–89 (5th Cir. 2009)  (citing *Williams v. Taylor*, 529 U.S. 362, 409–10 (2000)).

## III.  *Atkins* **and mental retardation**

The Supreme Court held in *Atkins* that the execution of mentally retarded persons constitutes cruel and unusual punishment in violation of the Eighth Amendment.  *See Atkins*, 536 U.S. at 321.  The *Atkins* Court did not define who is mentally retarded for purposes of eligibility for a death sentence but it referred generally to two definitions of mental retardation from the American Association on Mental Retardation (AAMR) and the American Psychiatric Association (APA).[3]  *Id.* at 309 n.3.  Clinical definitions of mental retardation

---

[3] The AAMR definition of mental retardation cited in the *Atkins* decision is as follows:

Mental retardation refers to substantial limitations in present functioning.  It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work.  Mental retardation manifests before age 18.

AAMR, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992) (AAMR 9th ed.).

The APA defines mental retardation similarly:

The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C).

AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th ed. 2000).  This definition is often referred to as the DSM-IV-TR definition.

In 2002, the AAMR modified its definition to read:

7

No. 09-70037

typically require subaverage intellectual functioning, significant limitations in adaptive skills, and manifestation before the age of eighteen. *Id*. at 318. Rather than adopt a definitive meaning of mental retardation, however, the Court left "'to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" *Id*. at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416–17 (1986)).

In accord with *Atkins*, the Mississippi Supreme Court set the standard for adjudging mental retardation in Mississippi in *Chase v. State*, 873 So. 2d 1013, 1028–29 (Miss. 2004), which it decided three months before it decided Wiley's case.[4] Under *Chase*, the trial court is to make the determination about retardation based on a preponderance of the evidence after an evidentiary hearing. *Chase*, 873 So. 2d at 1028–29. A defendant may not be adjudged retarded unless he presents, at a minimum, an expert opinion, to a reasonable degree of certainty, that (1) "[t]he defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association"; and (2) "[t]he defendant has completed the Minnesota Multi phasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering." *Id*. at 1029.

The Mississippi Supreme Court also set out in *Chase* the standard for determining whether a defendant is entitled to an evidentiary hearing on his mental retardation claim. The court held that a hearing would not be granted

---

Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

AAMR, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 1 (10th ed. 2002) (AAMR 10th ed.).

[4] Because the Mississippi Legislature has not addressed the issue of mental retardation in the context of death-penalty litigation, the *Chase* standard is controlling. *See Doss v. State*, 19 So. 3d 690, 709–10 (Miss. 2009).

unless a defendant files a motion to which he attaches an affidavit from at least one qualified expert "who opines, to a reasonable degree of certainty, that: (1) the defendant has a combined Intelligence Quotient ('IQ') of 75 or below, and; (2) in the opinion of the expert, there is a reasonable basis to believe that, upon further testing, the defendant will be found to be mentally retarded, as defined herein." *Id.* The court explained that because the cutoff for the intellectual functioning prong of the test for mental retardation is 75, defendants with an IQ of 76 or above do not qualify for *Atkins* protection. *Id.* at 1029 n.20. For defendants who were convicted before *Atkins* and *Chase* were decided, such as Wiley, the required expert affidavit may be submitted with the defendant's application for post-conviction relief. *Id.* at 1029–30.

As noted above, Wiley's position is that the affidavit he submitted from Dr. Grant with his state application for post-conviction relief satisfied the *Chase* standards to at least obtain an evidentiary hearing in state court. The district court agreed, and it held that the denial of a hearing in state court was a due process violation such that no deference was due to the state court decision. We agree with the district court, as we now explain.

## IV.  Deference and a federal hearing

When a petitioner has properly presented his *Atkins* claim in state court, and that court rejects it on the merits, we ordinarily apply AEDPA deference to the state court's judgment on legal and factual grounds. *Moore v. Quarterman*, 533 F.3d 338, 341 n.2 (5th Cir. 2008) (en banc); *see also* 28 U.S.C. § 2254(d). There is no dispute in this case that the Mississippi Supreme Court adjudicated Wiley's *Atkins* claim on the merits. But the question of affording deference to the state court's adjudication in this case is intertwined with the alleged due process violation by the state court's failure to conduct a hearing.

It is axiomatic that infirmities in state habeas proceedings under state law are not a basis for federal relief. *See Moore v. Quarterman*, 369 F.3d 844, 846

(5th Cir. 2004). Indeed, we have also held that a full and fair hearing in state court is not a prerequisite to applying the AEDPA's deferential scheme. *See Valdez v. Cockrell*, 274 F.3d 941, 946 (5th Cir. 2001). The Supreme Court has recognized, however, that a state court's unreasonable application of federal law, as a predicate for adjudicating a defendant's claim, may undermine the AEDPA deference given to the state court adjudication. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires.").

Thus, when a petitioner makes a prima facie showing of mental retardation, a state court's failure to provide him with an opportunity to develop his claim deprives the state court decision of the deference ordinarily due under the AEDPA. *Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007). As we explained in *Rivera*, even though *Atkins* left to the states the job of implementing procedures for determining who is mentally retarded, "it was decided against the backdrop of the Supreme Court's and lower court's due process jurisprudence." *Id.* That jurisprudence included *Ford v. Wainwright*, 477 U.S. 399 (1986), which required a hearing in accord with fundamental fairness and procedural due process for defendants who make a showing of ineligibility for a death sentence due to insanity. *Id.* (citing *Ford*, 477 U.S. at 424 (Powell, J., concurring in part and concurring in the judgment)).

We held in *Rivera* that the Texas Court of Criminal Appeals acted unreasonably by failing to conduct a full and fair evidentiary hearing in light of the petitioner's prima facie case of mental retardation. *Id.* at 357–58. We were guided by the Supreme Court's decision in *Panetti*, where the Court held that after a petitioner made a substantial showing of incompetency the state court's failure to provide the procedures elaborated on in *Ford* constituted an

No. 09-70037

unreasonable application of clearly established federal law. *Panetti*, 551 U.S. at 948. Moreover, the state court's error deprived its decision of AEDPA deference. *See id.* ("As a result of this error, our review of petitioner's underlying incompetency claim is unencumbered by the deference AEDPA normally requires.").

The teachings of *Panetti* and *Rivera* inform our conclusion in Wiley's case. We must decide whether Wiley presented a prima facie case of retardation, and was therefore entitled to a hearing. If he did, but the state court denied him the opportunity to develop his *Atkins* claim, the state court decision is not entitled to deference. In order to decide this question, we first closely examine the State's argument that Wiley was not entitled to a hearing under state law, and we then consider the question of deference to the state court decision in light of the procedure the court applied in Wiley's case.

Although Wiley was convicted before *Atkins* was decided, and although he filed his state post-conviction application before the Mississippi Supreme Court established the state's requirements for obtaining an *Atkins* hearing in *Chase*,[5] Wiley's affidavit from Dr. Grant (as well as other evidence) on its face met the *Chase* requirements for an evidentiary hearing, and the State conceded as much at oral argument.[6]

---

[5] Wiley filed his *Atkins* claim in state court on June 19, 2003. The Mississippi Supreme Court decided Chase on May 20, 2004, and it adjudicated Wiley's claim on August 26, 2004.

[6] Dr. Grant stated that Wiley's IQ was below the threshold of 75 and that Wiley was mentally retarded. *See Chase*, 873 So. 2d at 1028. Dr. Grant specifically found that Wiley's IQ was 68. He also concluded that Wiley had adaptive behavior deficits in communication skills, functional academic skills, and health and safety skills based on numerous tests administered to Wiley. Dr. Grant further concluded that Wiley had the "ability to learn and perform simple tasks, but with significantly impaired reasoning and problem solving skills." Dr. Grant concluded from the consistent poor performance reported in Wiley's school records that Wiley's mental retardation manifested prior to age eighteen.

11

No. 09-70037

The State contends, however, that Wiley was not entitled to a hearing under *Chase* because Wiley's pre-*Atkins* tests, which showed IQs of 73 and 78, included at least one score above the threshold for a mental retardation finding. It argues that under state law, as interpreted by the Mississippi Supreme Court, no defendant may obtain an evidentiary hearing if there was any test score above 75. It asserts that Wiley was treated no differently from any other defendant making an *Atkins* claim, and therefore he suffered no deprivation of due process by being denied a hearing.

In support of its argument that state law precludes an *Atkins* hearing when any single test score is above the threshold of 75, the State relies primarily on *State v. Branch*, 882 So. 2d 36 (Miss. 2004). In that case, the defendant's childhood IQ score at age five was 68, but post-arrest testing showed an IQ of 84. After noting the absence of evidence about adaptive skills deficits, the court held that Branch failed to make a prima facie showing of mental retardation. *Id.* at 51. Wiley's case is not substantially similar to *Branch*. Unlike Wiley, the defendant in *Branch* relied on tests done seventeen years earlier when he was a child, while a court-ordered psychologist who tested him after arrest said he had an IQ well above the threshold for mental retardation. *See id.* The court also found significant the absence of evidence concerning adaptive skills functioning. *Id.* In contrast, Wiley presented evidence of both recent and past IQ testing showing deficient intellectual functioning, as well as adaptive skills deficits. *Branch* does not present a situation like Wiley's.[7]

---

[7] In its brief, the State also relies on *Scott v. State*, 878 So. 2d 933 (Miss. 2004) (*Scott I*), a direct appeal, where the defendant presented evidence that his IQ score from childhood was 48 and that his post-arrest IQ score was 60. His own expert questioned the validity of the childhood score, however, and testified that he believed Scott was actually functioning at a much higher level. *Id.* at 948. The state court held that the evidence was insufficient to require an evidentiary hearing, but it noted that if the defendant presented the required evidence and affidavits along with an application for post-conviction relief (PCR), a hearing could be warranted. *Id.* Scott, like Wiley, subsequently did provide additional affidavits and evidence in a "lengthy" PCR application, and he was granted a hearing. *See Scott v. State*, 938

No. 09-70037

Contrary to the State's argument that a single IQ score may deny a defendant an *Atkins* hearing under state law, the Mississippi Supreme Court's decision in Wiley's case to deny a hearing and decide the mental retardation question appears to be an anomaly. In *Chase* itself, the Mississippi Supreme Court specifically recognized the due process underpinings at the core of an *Atkins* hearing, and the importance of a hearing even in the face of minimal or controverted evidence. *See Chase*, 873 So. 2d at 1020–21 (noting that although the State had raised "valid points" in contesting the defendant's mental retardation claim, its task was "to determine whether Chase is entitled to a hearing, rather than weigh the credibility of evidence to be presented at that hearing" and that because both the *Atkins* decision and its guidance in *Chase* were unavailable to the defendant, due process required it "to allow the motion to be filed in the trial court, enabling Chase and the State to fully present the trial judge evidence as required by *Atkins*"). Furthermore, decisions of the state court before and after *Chase* undermine the State's position that a single IQ score will automatically disqualify a defendant from an *Atkins* hearing.

For example, in *Thorson v. State*, 994 So. 2d 707, 715 (Miss. 2007), which was decided after *Chase* and is very similar to Wiley's case, the record showed that the defendant's IQ around the time of the murder offense was 77—above the *Chase* threshold. At Thorson's trial, a doctor testified that a subsequent test showed the defendant's IQ to be 74. The doctor also testified that Thorson was "borderline mentally retarded." *Id*. At sentencing, the same doctor testified that Thorson was "mentally handicapped" but not to the degree of the mentally retarded. *Id*. Nevertheless, in connection with Thorson's *Atkins* claim in his

---

So. 2d 1233, 1238 (Miss. 2006) (*Scott II*). In neither *Scott I* nor *Branch* did the defendant present an affidavit consistent with *Chase* that established that the defendant had subaverage intellectual functioning and adaptive skills deficits, as Wiley did in this case.

13

No. 09-70037

application for post-conviction relief, Thorson, like Wiley, submitted an affidavit from another doctor who opined that Thorson's IQ was 70, that he had adaptive behavior deficits, and that the onset of the deficits occurred before age eighteen. *Id.* at 715–16. The Mississippi Supreme Court held that Thorson "met the requirements established . . . in *Chase*" and remanded the matter to the trial court for an evidentiary hearing. *Id.* at 716.

The sequence of IQ test scores in *Thorson* mirrors the sequence in Wiley's case. In both instances the defendant had two reported IQ scores before *Atkins*, one above Mississippi's threshold of 75 and one below, and one post-*Atkins* IQ score that was below the threshold. In both cases, the defendant submitted an expert's affidavit opining that he met the definition for a mentally retarded person. The Mississippi Supreme Court granted Thorson a hearing on facts nearly indistinguishable from Wiley's case. The court also granted a hearing in another case involving multiple IQ scores decided before *Chase* in *Russell v. State*, 849 So. 2d 95, 148 (Miss. 2003). There the defendant received a hearing even though one of his two IQ scores, which were 68 and 76, was above the threshold for mental retardation. In light of these cases, the State's argument that Wiley was treated no differently from any other defendant with several IQ test scores who makes an *Atkins* claim is seriously undermined.[8]

---

[8] A survey of the Mississippi case law shows that the Mississippi Supreme Court has routinely granted evidentiary hearings as long as the *Chase* requirements are met even in the face of weak or controverted evidence. *See, e.g., Doss v. State*, 882 So. 2d 176, 193 & n.1 (Miss. 2004) (granting the petitioner an evidentiary hearing despite "numerous legitimate questions concerning [the petitioner's] claim" and noting in the face of inconsistencies in the evidence "that is precisely the procedure established by this Court in *Chase*, which allows the State, as well as Doss, to offer evidence in support of their respective arguments"); *Smith v. State*, 877 So. 2d 369, 398 (Miss. 2004) (where petitioner's evidence showed an IQ of 75 at age 13, but a psychologist opined that the petitioner's education records suggested only borderline mental retardation, the state supreme court held that "[n]otwithstanding the dearth of evidence," it could not "constitutionally deny [the petitioner] the opportunity to present the issue of his possible mental retardation to the trial court" in an evidentiary hearing); *Carr v. State*, 873 So. 2d 991, 1007 (Miss. 2004) (granting a hearing "[n]otwithstanding the evidence," which consisted of minimal testimony from a doctor at sentencing that the petitioner was mildly

14

No. 09-70037

The State also argues at some length that Wiley's single IQ score of 78 in 1994 automatically disqualified him from an evidentiary hearing unless that score is reduced by the Flynn effect. But it contends that neither the Mississippi Supreme Court nor this court has ever recognized the Flynn effect as scientifically valid. *See In re Mathis*, 483 F.3d 395, 398 n.1 (5th Cir. 2007); *Salazar*, 443 F.3d at 433 n.1. The Mississippi Supreme Court made no mention of the Flynn effect, and we therefore need not address what, if any, impact it has in this case. Even without considering the Flynn effect, Wiley had two IQ scores that fell below the threshold established by the Mississippi Supreme Court to obtain an evidentiary hearing. We are not prepared to hold, as the State would have it, that one IQ score, by itself, conclusively precludes an evidentiary hearing when the Mississippi Supreme Court did not base its decision on that fact; there were other test scores below the mental retardation threshold; the state court has otherwise followed a fairly liberal policy in granting evidentiary hearings, even in the face of minimal evidence and multiple IQ scores; and at least one expert, Dr. Grant, provided a specific opinion in accord with *Chase* that Wiley is mentally retarded. The State's contention that Wiley was not entitled to a hearing under *Chase* is therefore unavailing.

This does not end the inquiry, however, as we must next consider whether the state court decision was nevertheless entitled to AEDPA deference despite Wiley's satisfaction of the requirements for an evidentiary hearing. The state court in this case apparently decided that it should adjust the standards that it had established in *Chase*. The court stated that "evolving standards" for determining who is mentally retarded required it "to expand on the procedure to be used in reaching a determination of mental retardation[.]" *Wiley*, 890

---

retarded and testimony from a school counselor that problems at school were likely from a lack of attendance, without any discussion of specific IQ test scores).

15

So. 2d at 897.   The court held that it would therefore "consider the entire record before it in deciding whether to grant an *Atkins* hearing."   *Id.*

We will ordinarily defer to a state court's interpretation of its own law, *see Woodfox v. Cain*, 609 F.3d 774, 816 (5th Cir. 2010), and we find no fault in the state court's use of evolving standards to make the determination whether to grant a hearing, or its consideration of the entire record.   A state court's precedent certainly is not set in stone, and the court must be able to change its rules if, in its judgment, it is advisable to do so.   Indeed, state courts are granted much leeway in determining when a hearing is required, but in determining whether to give deference to the state court's decision here, we must consider whether that court's application of its own standards and precedent resulted in a denial of due process under the *federal* Constitution.   *See also Panetti*, 551 U.S. at 950–51 ("If [the failure to provide a competency hearing] did, in fact, constitute a violation of the procedural framework Texas has mandated for the adjudication of incompetency claims, the violation undermines any reliance the State might now place on Justice Powell's assertion that 'the States should have substantial leeway to determine what process best balances the various interests at stake.'") (quoting *Ford*, 477 U.S. at 427).   We conclude from our review of the relevant case law and the record before the state court that the state court's departure from its own *Chase* standards in the face of Wiley's evidence of retardation failed to provide Wiley with the minimum constitutional protections.

It is evident from the Mississippi case law that up until the Mississippi Supreme Court decided Wiley's case, the court remanded *Atkins* claims to the trial court for an evidentiary hearing on the retardation question when the *Chase* requirements (or what became the *Chase* requirements) were met.   The court has continued to follow this procedure even after deciding Wiley's case. But in the instant case, the court unexpectedly proceeded to a merits-based determination of factual questions and essentially required Wiley to prove his

claim at the prima facie stage, pretermitting the opportunity for the hearing and the fuller development of the evidence that *Chase* contemplated.

By adjudicating Wiley's mental retardation claim without telling him that it would do so, the state court implicated the "core due process concepts" of notice and foreseeability. *See Rogers v. Tennessee*, 532 U.S. 451, 459 (2001).  The state court applied an unexpectedly more stringent process to Wiley without notice, contrary to its announced procedure in numerous cases.  *Cf. Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964) ("When a state court overrules a consistent line of procedural decisions with the retroactive effect of denying a litigant a hearing in a pending case, it thereby deprives him of due process of law . . . ."); *see also Janecka v. Cockrell*, 301 F.3d 316, 324 n.11 (5th Cir. 2002) (noting that due process is implicated where retroactive judicial alterations of common law doctrines are "'unexpected and indefensible by reference to the law which had been expressed prior to the conduct at issue'" (quoting *Rogers*, 532 U.S. at 462)); *Talavera v. Wainwright*, 468 F.2d 1013, 1015–16 (5th Cir. 1972) (holding that state supreme court's retrospective application of a state severance statute rather than its less stringent interpretation of the prior rule in effect at time of trial was a violation of due process).  Had the state court followed its established procedures and remanded Wiley's case to the trial court for a hearing, or had it given notice to Wiley that his pleading was deficient and that it intended to adjudicate fully the *Atkins* claim, Wiley could have amended his state habeas application or supplemented his claim with additional evidence.  *See, e.g.*, *Bishop v. State*, 882 So. 2d 135, 151 (Miss. 2004) (holding on direct appeal that defendant who supported his *Atkins* claim only with school records and family members' affidavits was not entitled to a hearing but that if he filed an affidavit that complied with *Chase* he could be entitled to a hearing).  As it was, Wiley was left to believe that the state habeas application he filed before the *Chase* decision was sufficient because he had already filed an expert's affidavit in

17

No. 09-70037

accord with *Chase* only to find later that the state court reached a contrary conclusion by departing from its previously announced standards for determining who gets an *Atkins* hearing.[9]

Moreover, a review of the state court's reasons for rejecting Wiley's claim of retardation and the specific evidence presented demonstrates the disputed nature of the facts and bears out the need for a hearing to test the arguments of both sides. Instead of granting a hearing, the state court decided the retardation question itself and held that Wiley was not retarded because, in its view, Wiley's family affidavits "did not allege or establish that Wiley is mentally retarded." *Wiley*, 890 So. 2d at 896–97. It found compelling the State's argument based on the family affidavits that retarded people do not perform such functions as driving tractors, joining the Army, obtaining a driver's license, and supporting their families.[10] *Id.*

Wiley's motion for rehearing cast material doubt on such an argument, however. In the supplemental affidavit in support of Wiley's motion for rehearing, Dr. Grant opined that "mentally retarded persons do indeed 'hold

---

[9] Relying on its decision in Wiley's case, the Mississippi Supreme Court said in a subsequent opinion that technical compliance with the *Chase* requirements is insufficient to warrant a hearing if the record evidence "overwhelmingly belies" the mental retardation claim. *Hughes v. State*, 892 So. 2d 203, 216 (Miss. 2004). In a subsequent federal habeas petition, the federal district court held that the state court's failure to conduct a hearing in the face of a prima face case of mental retardation denied Hughes due process. *See Hughes v. Epps*, 692 F. Supp. 2d 533, 543 (N.D. Miss. 2010). We note that the State did not appeal that holding. We also believe that the evidence in Wiley's case did not "overwhelming belie" his claim.

[10] In *Chase*, the State made a similar argument and offered evidence that the petitioner was never in special education classes, never failed a grade in school, played quarterback on the football team, completed a welding course and became a certified welder, performed yard work and washed cars, cooked for his mother, had a girlfriend, and had no deficits in social skills. *Chase*, 873 So. 2d at 1022. Despite the fact that this evidence "would certainly be persuasive and interesting to the trial judge at the hearing," the Mississippi Supreme Court permitted a hearing because the petitioner had "arguably demonstrated that his IQ falls within the range of possible mental retardation, and because he has presented an affidavit which asserts that he suffers from 'mild mental retardation.'" *Id.* at 1022, 1023.

18

jobs,' 'drive cars,' and 'support families.'" According to Dr. Grant, there is a "widely-recognized view within the medical community that mentally retarded persons are often able to perform such tasks." Dr. Grant supported his assertions with attached excerpts from psychiatric literature. *See* Bryan H. King, M.D., et al., *Mental Retardation, in* COMPREHENSIVE TEXTBOOK OF PSYCHIATRY VOL. II 2598 (Benjamin Sadock, M.D. & Virginia Sadock, M.D. eds., 7th ed. 2000) ("As adults, many [individuals with mild mental retardation] hold jobs, marry, and raise families . . . ."); AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 43 (4th ed. 2000) (DSM-IV-TR) ("By their late teens, [persons with Mild Mental Retardation] can acquire academic skills up to approximately the sixth-grade level. During their adult years, they usually achieve social and vocational skills adequate for minimum self-support . . . . With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings."). In light of this evidence, Wiley's ability to function *vel non* was the type of clearly disputed fact that could benefit from a hearing before the state court. *See Thompson v. Bell*, 580 F.3d 423, 436 (6th Cir. 2009) ("Regardless of whether Thompson's incompetency petition should be granted, his evidence has at least created a genuine issue about his competency, and therefore warrants an evidentiary hearing. . . . Because the Tennessee courts unreasonably applied federal law clearly established by *Ford*, this Court does not afford AEDPA deference to their dismissal of Thompson's petition.").

This conclusion is also supported by Wiley's school records, which show that Wiley attended school only from first to eighth grade, that his grades consisted of Ds and Fs in all subjects, with the exception of a few Cs and C minuses, and that he was twice socially promoted despite failing marks. Dr. Grant's testing revealed that Wiley's reading and writing ability are, at best, on

a fourth grade level. This evidence created at least disputed questions of fact about Wiley's abilities noted elsewhere in the record. *See Wiley*, 890 So. 2d 896-97 (noting that Wiley's family affidavits suggested Wiley "did 'pretty well in school'" and spent his prison time studying the Bible, reading, and writing to pen pals).

Wiley presented a prima facie case of mental retardation in his state court habeas application under the Mississippi standards for an *Atkins* claim, *see Chase*, 873 So. 2d at 1029, and his evidence and affidavits raised "serious questions about [Wiley's] possible retardation." *Rivera*, 505 F.3d at 357; *cf. In re Hearn*, 462 F.3d 413, 415 (5th Cir. 2006) (holding, albeit in another context, that a prima facie case of mental retardation "is simply a sufficient showing of possible merit to warrant a further [exploration] by the district court"). Therefore, faced with the threshold question of whether to allow Wiley's claim to proceed to a hearing, it was an unreasonable application of clearly established federal law for the Mississippi Supreme Court to deny Wiley's *Atkins* claim without a hearing, and the district court correctly concluded that it was not bound to afford the state court's decision deference. *See Rivera*, 505 F.3d at 357; *see also Panetti*, 551 U.S. at 948.

## V.  The merits of Wiley's *Atkins* claim

We must next consider whether the district court's determination that Wiley is mentally retarded was erroneous. As noted above, a claim of mental retardation in Mississippi requires proof that the defendant has subaverage intellectual functioning, significant deficits in at least two areas of adaptive functioning, and manifestation prior to the age of eighteen. *See Chase*, 873 So. 2d at 1027–29. A defendant must also prove through appropriate testing that he is not malingering. *Id.* at 1028–29.

No. 09-70037

## 1. Subaverage intellectual functioning

Whether a petitioner suffers from significantly subaverage intellectual functioning is a question of fact. *Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006). We will not disturb a district court's factual findings unless they are implausible in light of the record considered as a whole. *Rivera*, 505 F.3d at 361; *see Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574 (citation omitted).

The *Atkins* Court recognized that IQ scores ranging from 70 to 75 are generally considered to be the cutoff for the intellectual functioning prong of the test for mental retardation. *Atkins*, 536 U.S. at 309 n.5. The Mississippi Supreme Court has adopted as its cutoff for *Atkins* protection an IQ score of 75. *Chase*, 873 So. 2d at 1029 n.20.

Wiley was administered an IQ test five times between 1987 and 2009. The testing was done on two versions of the Wechsler test—the WAIS-R and the WAIS-III—and on the Stanford-Binet Intelligence Scales, Fifth Edition (the SB5). In addition to the testing by Dr. Fox and Dr. Grant discussed above, Wiley was tested by the court-appointed expert, Dr. O'Brien, and by the state's expert, Dr. Macvaugh.[11]

When the district court considered Wiley's scores, it noted that the experts' testimony and reports indicated that they were subject to a confidence interval

---

[11] Wiley's own expert, Dr. Swanson, testified that she did not administer a standardized IQ test because Wiley had already been tested several times, and she believed the results of another test could be inflated by the so-called practice effect.

No. 09-70037

(CI) of 95%, meaning that due to standard errors of measurement the experts would expect with 95% confidence that Wiley's true IQ would fall within a certain range around the reported score. The district court also noted that the experts debated the application of the Flynn effect. As noted above, the Flynn effect provides a reduction in IQ scores to account for inflation in the score based on the number of years since the test was normalized. All three experts who testified at the evidentiary hearing stated that the Flynn effect is generally accepted in the scientific community, but they did not agree as to whether an individual IQ score must be adjusted to reflect the phenomenon. Drs. O'Brien and Swanson testified that an adjustment should be considered, but Dr. Macvaugh disagreed. The district court noted that Wiley's full-scale IQ scores (FSIQ), the CI interval ranges, and the Flynn adjusted IQ scores were as follows:

| Date | Examiner | Test | FSIQ | 95% CI range | Flynn effect |
|------|----------|------|------|--------------|--------------|
| 1987 | Dr. Fox | WAIS-R | 73 | 68–78 | 70 |
| 1994 | Dr. Fox | WAIS-R | 78 | 73–83 | 73 |
| 2003 | Dr. Grant | WAIS-III | 68 | 65–73 | 65 |
| 2007 | Dr. O'Brien | WAIS-III | 70 | 67–75 | 66 |
| 2009 | Dr. Macvaugh | SB5 | 80 | 76–84 | 77 |

The State argues that the district court found Wiley mentally retarded because it erroneously applied the Flynn effect to Wiley's scores. It contends that without such an adjustment only Dr. Grant's score of 68 clearly falls within the range for mental retardation. The State urges that the Flynn effect should not be employed and that even if it is considered, Wiley's adjusted score on the SB5 was 77.

The State is incorrect that the district court found Wiley mentally retarded only because of the Flynn adjusted scores. The court explicitly stated that it was

22

"not holding that the Flynn effect must be applied to properly assess an individual's IQ, and it is not holding that failing to apply it is unreasonable." Instead, the court indicated only that it should be considered as one factor when interpreting Wiley's IQ scores in light of the unanimous opinion from the experts.[12]  We need not resolve the weight, if any, to be given to the Flynn effect, however, because the district court also found that even without it the evidence supported a finding that Wiley had significant subaverage intellectual functioning.  On the record before us, that finding is not clearly erroneous.

Dr. O'Brien's report opined that Wiley's full scale IQ without any adjustments for the Flynn effect was likely to be between 67 and 75.  Dr. O'Brien testified that the score of 80 obtained by Dr. Macvaugh, as well as the score of 78 obtained by Dr. Fox in 1994, were likely "outliers" insofar as they did not fit within the overall pattern of scores obtained across the range of testing.  Dr. Swanson testified that Wiley's scores from 1987 to 2007 were "fairly tight." Although her report made adjustments for the Flynn effect, it also reported that the four Wechsler tests had overlapping ranges between 68 and 70, which in her opinion was Wiley's true IQ score.

The State argues that Dr. Macvaugh's score of 80 precludes a finding that Wiley is mentally retarded.  It contends that the fact that a score may be an outlier does not render it invalid.  We reject the State's position that an IQ score above the cutoff for mental retardation automatically resolves a defendant's *Atkins* claim when the defendant has been tested as many times as Wiley has been tested and a majority of the scores fall within the mental retardation range. As discussed above, the State's contention is not found in the Mississippi Supreme Court's case law.  *Cf. Thomas v. Allen*, 607 F.3d 749, 757 (11th Cir. 2010) (rejecting argument that district court clearly erred in finding defendant

---

[12] In its written decision the court referred to "test obsolescence," which we interpret to be the same as the Flynn effect based on the experts' testimony at the evidentiary hearing.

mentally retarded where one of several IQ test scores was above the state's threshold: "There is no Alabama case law stating that a single IQ raw score, or even multiple IQ raw scores, above 70 automatically defeats an *Atkins* claim when the totality of the evidence (scores) indicates that a capital offender suffers subaverage intellectual functioning.").

To be sure, the Mississippi Supreme Court has held that a person with an IQ above 76 does not have a valid *Atkins* claim. *Chase*, 873 So. 2d 1029 n.20 ("[D]efendants with an IQ of 76 or above do not qualify for Eighth Amendment *Atkins* protection."). But we have found no state court authority indicating how to assess the defendant's true IQ score in the face of multiple IQ examinations. The court has said simply that a defendant must present expert evidence that he is mentally retarded and that he is not malingering. *Id.* at 1029. After hearing evidence from both the State and the defendant, the trial court is then to determine whether the defendant is mentally retarded from a *preponderance of the evidence. Id.* The state court treats *Atkins* hearings the same as any other evidentiary consideration. *See id.* (stating that after the defendant and the State present evidence as allowed by the Mississippi Rules of Evidence "the matter should proceed as other evidentiary hearings on motions"). Therefore, the district court here was not bound by a single reported IQ score, but rather was free to consider all the reported scores and testimony as part of its analysis of the evidence.

The hearing in this case was essentially a battle of the experts, who gave competing opinions as to Wiley's IQ and intellectual functioning. The calculation of a person's IQ score is imprecise at best and may come down to a matter of the examiner's judgment. *Cf. Clark*, 457 F.3d at 444 (noting that the "confidence band is designed to account for the measurement error inherent in intelligence testing"). The State's expert even testified that no test or examiner is perfect. Although Dr. Macvaugh disagreed with the opinions of Dr. Grant and Dr.

O'Brien, he testified that his disagreement was based on "examiner judgment" in the scoring of the IQ tests and conceded that "these things could be argued either way."

As noted by the district court, the record contains three expert assessments that explicitly found Wiley's IQ to be below 75, without any adjustments for the Flynn effect or practice effect. (Dr. Fox's score of 73 in 1987; Dr. Grant's score of 68 in 2003; and Dr. O'Brien's score of 70 in 2007.)  The record also contains opinions from three experts (Drs. Grant, O'Brien, and Swanson) that Wiley has subaverage general intellectual functioning, as required by *Atkins*.  Given the nature of IQ scoring and the presence of several IQ tests in the record, we do not believe it was clearly erroneous for the district court to place weight on these experts' opinions when determining Wiley's intellectual functioning.

The State's argument would have us simply accept the opinion of Dr. Macvaugh over the opinions of Dr. O'Brien, Dr. Swanson, and Dr. Grant.  We will not re-weigh the facts and evidence in order to reach a decision contrary to the district court's conclusion.  *See Anderson*, 470 U.S. at 574; *see also Rivera*, 505 F.3d at 363 (the district court is in the best position to weigh the evidence). The record supports the district court's assessment of Wiley's intellectual functioning, and we conclude that the district court did not clearly err in its finding from a preponderance of the evidence that Wiley satisfies this prong of the test for mental retardation.

## 2. Adaptive functioning deficits

A diagnosis of mental retardation requires not only subaverage intellectual ability but also significant deficits in adaptive functioning. *See Chase*, 873 So. 2d at 1028 & n.18. *"Adaptive functioning* refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural

background, and community setting." DSM-IV-TR at 42. To meet this prong of the test, clinical definitions of mental retardation found in both the DSM-IV-TR and the AAMR require proof of limitations in two or more adaptive skill areas, which include communication, self-care, home living, social skills, community use, self-direction, health, safety, functional academics, leisure, and work.[13] *See Atkins*, 536 U.S. at 309 n.3 (quoting AAMR 9th ed. at 5, and DSM-IV-TR at 41).

Wiley's adaptive functioning skills have been assessed four times: by Dr. Grant in 2003, by Dr. O'Brien in 2008, by Dr. Macvaugh in 2008–09, and by Dr. Swanson in 2009. Dr. Grant and Dr. Swanson used standardized measures of adaptive functioning to assist in their assessments of Wiley. Dr. Grant administered to Wiley the Independent Living Scale. Dr. Swanson used the Vineland-II Adaptive Behavior Scales (Vineland), as well as the Adaptive Behavior Assessment Scale (ABAS-II). Swanson used the standardized tests to gather information retrospectively by asking Wiley's grandmother and his former wife to recall Wiley's behavior at age fifteen and eighteen, respectively. Drs. Grant, O'Brien, and Swanson concluded that Wiley had sufficient adaptive functioning deficits to be considered mildly mentally retarded, while Dr. Macvaugh disagreed.

After reviewing the experts' reports and considering the testimony at the hearing, the district court held that Wiley met his burden of showing by a preponderance of the evidence that he suffers from significant deficits in the areas of functional academics, communication, and self-direction. Rather than

[13] As noted above, the tenth edition of the AAMR revised the definition to require proof of limitations in adaptive behavior as expressed in "conceptual, social, and practical adaptive skills." The AAMR indicates that its Terminology and Classification Committee made this change because of a lack of a single standardized measure of adaptive behavior that measures all of the original skills. AAMR 10th ed. at 81. Dr. O'Brien testified that the ninth and tenth editions of the AAMR look at the same types of adaptive behavior, but the tenth edition essentially groups into three categories the individual skill areas of the ninth edition. Both Dr. O'Brien and Dr. Swanson indicated that their diagnoses of Wiley were the same under both editions.

26

challenge these findings, the State presents two arguments that concern the process by which the court and the experts reached their conclusions about Wiley's adaptive behavior.

The State first asserts that the Mississippi Supreme Court found from the affidavits of Wiley's family and friends that Wiley did not have deficits in adaptive behavior, and that the state court's decision was not unreasonable. The affidavits at issue showed that Wiley often provided money to help pay household bills, possessed skill repairing vehicles and frequently helped friends and neighbors with auto repairs, provided transportation for others, volunteered for military service, and was a reliable worker who quit school to go to work to provide for his family.

Because we have determined that the district court did not err by declining to afford deference to the Mississippi Supreme Court's decision, the district court was not limited to consideration of this evidence at the hearing. Moreover, Drs. Grant, O'Brien, and Swanson all opined that mentally retarded persons could perform the types of activities noted in the affidavits. *See also Thomas*, 607 F.3d at 759 (rejecting State's argument that defendant was not retarded because he worked on a farm performing manual labor and driving a tractor and also held several other menial labor jobs where experts agreed these skills are consistent with mild mental retardation and State's own expert testified that mentally retarded persons can drive cars and hold menial jobs).

The State also contests the methodology used by Wiley's examiners, primarily Dr. Swanson. It argues that Swanson's retrospective use of the Vineland and the ABAS-II to ask about Wiley's past behavior was erroneous and that Dr. Swanson also incorrectly scored individual questions on the tests. We are unpersuaded by the State's rather cursory briefing of this issue.

The assessment of adaptive functioning deficits is no easy task. Because its conceptualization "has proven elusive," adaptive functioning "historically has

been assessed on the inherently subjective bases of interviews, observations, and professional judgment." *Doss v. State*, 19 So. 3d 690, 713 (Miss. 2009) (internal quotation marks and citation omitted).  The Mississippi Supreme Court has recognized that "there is not one test to determine mental retardation, including the adaptive functioning component" and that there has been no agreement among professionals as to the proper test for assessing adaptive behavior.  *Id.* at 712.  The district court here also recognized that there is debate among clinicians as to whether retrospective assessments are valid for determining adaptive functioning in an *Atkins*-related context.  Nevertheless, the district court found the testing by Dr. Swanson, which she corroborated with interviews of others and with direct probes of Wiley, to be sufficiently reliable for consideration.  We see no clear error in the district court's findings.  *See, e.g., id.* at 714 (holding in the face of similar expert disagreement about standardized adaptive testing and the adaptive functioning of the defendant that neither side's methodology was infallible and that the ultimate issue of whether the defendant is mentally retarded is up to the trial court after assessing the totality of the evidence and the credibility of the witnesses).  The record and evidence before the district court in this case supported the court's consideration of the information obtained by Dr. Swanson.

Although Dr. Macvaugh disagreed with Dr. Swanson's use of the ABAS and Vineland tests, even he agreed that some experts believe standardized instruments are necessary to assist in the assessment of adaptive behavior. The tenth edition of the AAMR specifically recommends the use of standardized measures and instruments, and it notes that the ABAS test "can be used to identify significant limitations in adaptive behavior." *See* AAMR 10th ed. at 76, 81, 83.  Furthermore, the authors of the Vineland test expressly state that retrospective interviews to obtain information about a subject's behavior at an earlier age is permissible in certain circumstances, including when the subject

is in a restricted environment, *such as prison*, and there is a question about the subject's adaptive functioning before coming to that environment. *See* SARA S. SPENCER, ET AL., VINELAND ADAPTIVE BEHAVIOR SCALES, SECOND ED., *Expanded Interview Form Manual*, 28 (emphasis added).

The AAMR 10th edition recommends that because the adaptive functioning assessment typically takes the form of interviewing third-parties, the respondent should be someone who is well acquainted with the subject's behavior over an extended period, such as a parent, teacher, or direct-service provider. AAMR 10th ed. at 85. Here, Dr. Swanson spoke with Wiley's grandmother and with his former wife. She also spoke with other persons familiar with Wiley, such as his former supervisor, to probe the information about him. The State offers no evidence or even a cogent argument that the answers given by Wiley's grandmother and wife were incorrect or faulty. Dr. Macvaugh also admitted that speaking with Wiley's family members, as Dr. Swanson did, was something he also should have pursued. *See Doss*, 19 So. 3d at 714 ("Interviews with family members, and others familiar with an individual's typical behavior over an extended period of time in various settings, can supplement or aid in the interpretation of test results.").

At bottom, the State would have us accept the opinion of its own expert as a substitute for the opinions of Dr. Grant, Dr. O'Brien, and Dr. Swanson. But the district court, having presided over the evidentiary hearing, "is in a better position than this court to judge and weigh the credibility of the witnesses who testified on the extent, duration, and causes of [Wiley's] adaptive functioning limitations." *Rivera*, 505 F.3d at 363. On the record before us, we cannot say that the district court erred by considering the opinions of the experts who testified that Wiley has adaptive functioning deficits as part of the totality of the evidence. *See Doss*, 19 So. 3d at 712.

No. 09-70037

As noted above, the State has failed to brief the district court's factual findings on the specific areas of functional skills deficits or explain how those findings are clearly erroneous, and we may consider that issue waived. *See, e.g., Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004) ("Failure adequately to brief an issue on appeal constitutes waiver of that argument."). For the sake of completeness, and to give the district court's decision context, however, we briefly mention some of the deficits found by the district court.

First, all of the experts agreed that Wiley possesses significant deficits in the area of functional academics and that his functional academic ability is between the third and sixth grade levels. Dr. Grant administered to Wiley the Wide Range Achievement Test-Revision III (WRAT-III) and the Nelson-Denny Reading Comprehension Test. He concluded that Wiley was functioning on a fourth grade level.[14] Dr. O'Brien tested Wiley with the fourth edition of the WRAT (WRAT-4) and found results consistent with Dr. Grant's earlier report.[15] Dr. Macvaugh also administered the WRAT-4 and reported similar results and conclusions.[16] Dr. Swanson concluded from her own administration of the

[14] Dr. Grant reported that Wiley scored a 68 (1st percentile) on the WRAT-III, which is a grade equivalent of 4.2. Wiley scored a 64 on the reading subtest for word recognition, which is a grade equivalent of 4.3, and a 70 on spelling, which is equivalent to grade 5.1. The Nelson-Denny Reading Comprehension Test yielded a grade equivalent of 4.1.

[15] On the WRAT-4, as reported by Dr. Grant, Wiley achieved the following scores: Word Reading standard score of 77, fifth grade level; Sentence Comprehension standard score of 74, sixth grade level; Spelling standard score 74, fourth grade level; Arithmetic standard score 76, fourth grade level.

[16] The scores obtained by Dr. Macvaugh for the WRAT-4 were as follows: Word Reading standard score of 77 (6th percentile; grade equivalent of 5.7); Sentence Comprehension standard score of 74 (4th percentile; grade equivalent of 6.5); Spelling standard score of 72 (3rd percentile; grade equivalent of 4.3); Math Computation standard score of 81 (10th percentile; grade equivalent of 5.4); and Reading Composite standard score of 73 (4th percentile).

WRAT-4, as well as the Woodcock Johnson and Kaufman Tests of Educational Achievement, that Wiley was functioning on a third to fourth grade level.[17]

Wiley's military records also support a finding that Wiley possesses limited academic skills. Wiley's Army record indicates that he was forced to abandon his training in radio operator school because of failing tests and "difficulty relating the information contained in technical manuals to the appropriate equipment." The military instructors concluded that "this course of training is too difficult for him to complete in a reasonable length of time." Wiley's "poor academic progress" resulted in a "resentful attitude." Wiley was discharged from the Army when his commander determined that "[r]eassignment of this individual would not be in the best interest of the Army because of his extremely negative attitude towards the military and his physical *and mental limitations*." (Emphasis added.)

The district court also concluded that Wiley had deficits in the adaptive functioning area of communication, as evidenced by Wiley's oral comprehension scores on academic tests and language battery, Wiley's school records, the experts' interviews of Wiley, and reports of interviews with Wiley's family and friends. The record and opinions of the experts supports the district court's conclusion.

Dr. Swanson testified that her testing showed that at the age of eighteen Wiley had the communication skills of someone six to nine years old. She concluded that Wiley could not be given verbal directions, but that he could learn

---

[17] Dr. Swanson indicated in her report that Wiley's various test results were corroborated by his school records, which showed that he passed the fourth grade with minimal grades but had been socially promoted or retained in subsequent years. She opined that such an "academic plateau" was common in persons with mild mental retardation, who often make slow progress early but plateau between fourth and sixth grade. Wiley's school records show that he repeated both the fifth and sixth grades. Following his grandfather's death, Wiley dropped out of school in the eighth grade to work on his grandparents' farm. Some of the problems noted by Dr. Swanson involved Wiley's memory, abstract reasoning, and reading and writing skills.

tasks visually upon demonstration. Interviews with Wiley's grandmother and former wife revealed that Wiley had been a shy child, was "late to talk," could not remember oral instructions or give complex directions, and did not express his feelings well. Dr. Swanson concluded that Wiley had communication deficits in areas of receptive vocabulary, oral expression, listening comprehension or following directions, and written language. Dr. Grant also gave Wiley a series of tests to gauge his communication skills, including the Oral and Written Language Scale (OWLS) and the Expressive Vocabulary Test (EVT). Dr. Grant stated in his report that Wiley's Oral Composite score of 71 (third percentile) and score of 52 (less than first percentile) on the EVT "indicated significant deficits in the area of communication skills." Dr. O'Brien also found deficits in communication skills, placing weight on Wiley's school records.

We note, as did the district court, that Dr. Macvaugh found no deficits in communication skills in part because affidavits in the record from Wiley's family and friends indicated that he continued to correspond with them in written letters and by telephone after he was incarcerated. But Dr. Macvaugh qualified his opinion about the family affidavits by noting that because the affidavits had been prepared for the purpose of mitigation, "there is some concern with regard to their validity." Dr. Swanson also indicated that Wiley's ability to write was painfully slow, as shown by his taking two minutes to write six dictated words of a nine-word sentence.

In the functional area of self direction, Dr. O'Brien testified that self-direction concerns whether a person can independently decide what to do and carry out certain activities without someone directing him. Self-direction skills are "related to making choices; learning and following a schedule; initiating activities appropriate to the setting, conditions, schedule, and personal interests; completing necessary or required tasks; seeking assistance when needed; resolving problems confronted in familiar and novel situations; and

32

demonstrating appropriate assertiveness and self-advocacy skills." AAMR 9th ed. at 40. The district court concluded that Wiley's deficits in self-direction skills were supported by adaptive assessments by the experts, Wiley's work history, his gambling and alcohol addictions, and reports from family and friends.

The record shows that Wiley consistently relied on others for virtually all direction of his life and daily living, including finances, healthcare, and employment. Wiley relied on his grandmother and then his wife to handle his money. Although he was a hard worker, Wiley primarily worked manual labor jobs and relied on his in-laws to find him work. Wiley's grandmother stated that when Wiley's grandfather died, Wiley was unable to make basic decisions about the farm, and he instead sought advice from his grandfather's friends. He later sought help from his in-laws even after he and his wife separated. As a child, Wiley was slow to master hygiene, dressing, and toileting skills, and his older sister had to help teach him how to dress and groom. Wiley's grandmother bought his clothes and made selections for him when he was as old as fifteen, and then his wife took over that task when he moved in with her family. Although Wiley helped around the house with the trash and yard work, his grandmother and then his wife did all the cooking, cleaning, and laundering.

Wiley indicated in probes with Dr. Swanson that his grandmother and his wife managed his money; after he separated from his wife he would cash his paychecks at the liquor store, pay his bills, and then drink or gamble his money away. When Wiley was in the Army, the military arranged all of his travel and someone always told him where to go. Dr. Swanson reported that in order to learn a new task Wiley required many repetitions, a lot of time, and continuous drill. She opined that military and court records and interviews with Wiley and his wife substantiate his poor self-direction as an adult. We conclude from the above evidence that the district court's finding that Wiley had significant deficits in adaptive functioning skills was not clearly erroneous. *See, e.g., Thomas*, 607

F.3d at 759 (finding of limitations in self-direction was not clearly erroneous where "record indicates Thomas was immature both socially and mentally, that he required lots of repetition to follow instructions, and that he could not live independently").

### 3. Onset before age eighteen

In concluding that Wiley's significant subaverage intellectual functioning and adaptive functioning deficits manifested prior to age eighteen, the district court relied on Wiley's school records, reports of Wiley's family members, and the adaptive assessments conducted by Dr. Swanson. The court also noted that Wiley's military records, which documented Wiley's service at age nineteen, provided a helpful snapshot of Wiley's intellectual functioning and adaptive skills close in time to the age of eighteen.

The State argues only that the Mississippi Supreme Court discounted Wiley's school records because of Wiley's poor attendance record at school, and that the state court's decision was reasonable. However, we have already decided that the district court was not bound to defer to the state court decision.

The State is correct that Wiley's school records show numerous absences, and Dr. O'Brien agreed that missing school could result in poor grades. But he also testified that having difficulty in school could affect whether a person chooses to attend school regularly. The district court noted that Wiley's academic struggles commenced from the beginning of his formal education when he received all Ds, except for one C-, in the first grade. Wiley's best year academically was in the sixth grade when he had the fewest absences, but that was also Wiley's second attempt at sixth grade.

We agree with the district court that evidence in addition to Wiley's academic performance also supports the conclusion that Wiley's deficits manifested before the age of eighteen. As noted by the district court, Wiley's grandmother reported Wiley's early childhood difficulties learning to speak,

expressing his feelings, mastering hygiene and dressing skills, performing basic skills like making his bed and putting away his possessions, and requiring help with making purchases. Wiley's wife later provided daily assistance, and the military records note physical and mental limitations just past Wiley's eighteenth year. Based on the record, we do not find clear error in the district court's determination.

### 4. Malingering

The final requirement for a finding of mental retardation is evidence through appropriate testing that Wiley is not malingering. The State does not address this requirement in its brief, but as noted by the district court, each of the experts who testified at the evidentiary hearing conducted testing to probe for malingering. Dr. O'Brien, Dr. Swanson, and Dr. Macvaugh each indicated that there was no evidence that Wiley was feigning or malingering intellectual or adaptive functioning deficits.[18]

### VI. Conclusion

Based on the foregoing, we hold that the district court's conclusion that Wiley is mentally retarded and therefore ineligible for a death sentence under *Atkins* was not clearly erroneous. The district court's judgment is AFFIRMED.

Judge Jolly concurs in the judgment only.

---

[18] Dr. O'Brien tested Wiley with the 21 Word Test and found a "normal result" with "no indication of lack of motivation, dissimulation, or malingering." Dr. Swanson administered the Rey's 15-word List, which indicated "adequate effort and no signs of malingering were evident." Dr. Macvaugh administered the Test of Memory Malingering (TOMM) to Wiley and concluded that "there was no indication that he attempted to feign cognitive deficits."