# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 27, 2011

Lyle W. Cayce
Clerk

No. 11-70010

BOBBY LEE HINES,

Petitioner–Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent–Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:06-CV-320

Before KING, BENAVIDES, and ELROD, Circuit Judges.

KING, Circuit Judge:[*]

Bobby Lee Hines was convicted of capital murder in a jury trial in Texas
and sentenced to death. The Texas Court of Criminal Appeals affirmed his
conviction and sentence on direct appeal, and Hines unsuccessfully sought both
state and federal habeas relief. Hines now seeks a certificate of appealability
pursuant to 28 U.S.C. § 2253 to challenge the district court's denial of successive
habeas relief, arguing, under *Atkins v. Virginia*, 536 U.S. 304 (2002), that he

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 11-70010

cannot be executed because he is mentally retarded.  We hold that reasonable jurists could not debate the district court's conclusion that Hines has failed to show that he is ineligible for a death sentence under *Atkins*.  Accordingly, we DENY his request for a certificate of appealability.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Petitioner–Appellant Bobby Lee Hines ("Hines")[1] was convicted of capital murder on March 19, 1992, and sentenced to death.  The Texas Court of Criminal Appeals ("CCA") rejected his direct appeal in May 1995.  *See Hines v. State*, No. 71,442 (Tex. Crim. App. May 10, 1995) (unpublished).  His initial state habeas appeal was also denied by the CCA.  *Ex parte Hines*, No. 40,347-01 (Tex. Crim. App. 1999) (unpublished).  The district court denied Hines's initial federal habeas appeal, see *Hines v. Cockrell*, No. 3:99–CV–0575–G, 2002 WL 108301 (N.D. Tex. Jan. 22, 2002), and this court subsequently denied his request for a Certificate of Appealability ("COA"), see *Hines v. Cockrell*, 57 F. App'x 210, 2002 WL 31956173, at *7 (5th Cir. Dec. 31, 2002), *cert. denied Hines v. Dretke*, 540 U.S. 827 (2003).

After this initial round of appeals by Hines, the Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002), on June 20, 2002, in which it held that the execution of the mentally retarded violated the Eighth Amendment.  *Id.* at 320–21.  Shortly before his scheduled execution date of December 11, 2003, Hines filed in state court another application for a writ of habeas corpus, asserting that he is mentally retarded and therefore could not be executed pursuant to *Atkins*.  After finding that Hines met the requirements for a subsequent writ application, the CCA stayed Hines's execution pending review of his *Atkins* claim.  *Ex parte Hines*, No. 40,347-02 (Tex. Crim. App. Dec. 9, 2003).

---

[1] We refer to Respondent–Appellee as "the State."

No. 11-70010

Hines filed supplemental briefs and attached multiple exhibits and affidavits to support his claim in the state court. The State responded with its own briefs and evidence. The trial court reviewed this new evidence, but did not hold a live evidentiary hearing. The trial court entered detailed findings of fact and conclusions of law holding that Hines is not mentally retarded and therefore eligible for the death penalty. *Ex parte Bobby Lee Hines*, No. W91-21411-I(B), at 54, ¶ 246–51 (June 23, 2005). The CCA adopted the trial court's findings and conclusions, and denied Hines habeas relief. *Ex parte Bobby Lee Hines*, WR-40,347-02, 2005 WL 3119030 (Tex. Crim. App. Nov. 23, 2005).

Hines then applied for and received authorization from this court to file a successive habeas corpus application in the district court. *In re Hines*, No. 05-11342 (5th Cir. Feb. 2, 2006). Hines filed a motion for an evidentiary hearing, which was granted, and the magistrate judge held a live evidentiary hearing on August 26 and 27, 2009, to determine whether Hines is mentally retarded. Following this hearing, the magistrate judge concluded that Hines is not retarded and recommended that habeas relief be denied. *Hines v. Thaler*, No. 3:06-cv-00320-G, Findings and Recommendation of the United States Magistrate Judge (N.D. Tex. Mar. 22, 2010). Over Hines's objection, the district court adopted the magistrate judge's findings and conclusions and denied Hines habeas relief. *Hines v. Thaler*, No. 3:06-cv-00320-G, Order Accepting Findings and Recommendation of the United States Magistrate Judge and Denying a Certificate of Appealability (N.D. Tex. Aug. 18, 2010). After a second, and explicitly de novo, review of the record, the district court also rejected Hines's Rule 59(e) motion to alter its judgment. *Hines v. Thaler*, No. 3:06-cv-00320-G, Memorandum Opinion and Order (N.D. Tex. Apr. 4, 2011).

Hines now seeks a COA in order to appeal the district court's decision not to grant him habeas relief on *Atkins* grounds. In determining whether Hines is entitled to a COA, *inter alia*, we analyze what level of deference the district court

3

should have applied to the state court's determination of Hines's *Atkins* claim.

## II. DISCUSSION

### A.     Standard of Review

As Hines filed his federal habeas petition in 2003, his request for a COA is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See* 28 U.S.C. § 2253. In order to appeal, Hines must first obtain a COA, which is a jurisdictional prerequisite to our ability to review the district court's dismissal of a habeas petition and denial of relief. 28 U.S.C. § 2253(c)(1)(A); *Miller-El v. Cockrell*, 537 U.S. 322, 335–36 (2003). A COA can be granted "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). This standard does not necessitate success on the underlying merits of the habeas claim: "[A] claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El*, 537 U.S. at 338. As Hines faces the death penalty, "'any doubts as to whether a COA should issue must be resolved in [Hines's] favor.'" *Foster v. Quarterman*, 466 F.3d 359, 364 (5th Cir. 2006) (quoting *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000)).

In assessing whether to grant a COA, we are restricted "to a threshold inquiry into the underlying merit of [Hines's] claims." *Miller-El*, 537 U.S. at 327. In essence, we are limited to "an overview of the claims in [Hines's] habeas petition and a general assessment of their merits." *Id.* at 336. However, we

carry out this analysis with the understanding that AEDPA normally mandates deference to the state court's findings of fact and conclusions of law.

A federal court "may grant habeas corpus relief to [Hines] only if the state court's adjudication of his claim on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Rabe v. Thaler*, 649 F.3d 305, 308 (5th Cir. 2011) (quoting 28 U.S.C. § 2254(d)). In interpreting § 2254(d)'s provisions, the Supreme Court has explained that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application [by the state court] must also be *unreasonable*." *Williams v. Taylor*, 529 U.S. 362, 411 (2000) (emphasis added).  In light of this admonition, "[a] state court's decision is contrary to clearly established federal law if it applies a rule that contradicts the governing law set forth in Supreme Court cases . . . or if the state court decide[s] a case differently than the United States Supreme Court previously decided a case on a set of nearly identical facts."  *Jones v. Cain*, 600 F.3d 527, 535 (5th Cir. 2010) (internal quotation marks and citations omitted). Similarly, "[a] state court's decision involves an unreasonable application of clearly established federal law if the state court 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.'" *Fields v. Thaler*, 588 F.3d 270, 273 (5th Cir. 2009) (quoting *Williams*, 529 U.S. at 407–08).

Recently, the Supreme Court, in *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011), made clear that "review under [28 U.S.C.] § 2254(d)(1) is limited to the

record that was before the state court that adjudicated the claim on the merits." *Id*. at 1398; *see also Greene v. Fisher*, 132 S. Ct. 38, __ (2011). As the Court explained, "§ 2254(d)(1) review [should] focus[] on what a state court knew and did," *Pinholster*, 131 S. Ct. at 1399, such that "evidence introduced in federal court has no bearing on § 2254(d)(1) review." *Id.* at 1400; *see also Greene*, 132 S. Ct. at __ (holding that under § 2254(d)(1), "clearly established Federal law, as determined by the Supreme Court of the United States" includes only Supreme Court decisions as of the time of the relevant state-court adjudication on the merits).

## B.    AEDPA Deference and Due Process

As a preliminary matter, Hines argues that the district court incorrectly applied AEDPA deference to the state court's determinations. He contends that, by deciding his *Atkins* claim without a live hearing, the state court violated federal law and that therefore the district court should have reviewed his claim de novo.

At the COA stage, we ask "whether the District Court's application of AEDPA deference . . . was debatable amongst jurists of reason." *Miller-El*, 537 U.S. at 341. As we explained above, AEDPA normally mandates deference to state court proceedings. Indeed, a habeas petitioner may not raise a claim for federal habeas relief on the basis of deficiencies in his state habeas proceeding. *See Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004) (per curiam) ("It is axiomatic that infirmities in state habeas proceedings do not constitute grounds for federal habeas relief." (internal quotation marks and citation omitted)).

Nonetheless, the Supreme Court has clarified that a state court's unreasonable application of *federal* law within the broader context of adjudicating a defendant's claim can negate the requirement of AEDPA deference. *See Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable

application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires.").[2]  Such federal law may include due process, as "[e]ven though *Atkins* did not specifically mandate any set of procedures, it was decided against the backdrop of the Supreme Court's and lower court's due process jurisprudence." *Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007).

We applied *Panetti*'s holding in an *Atkins* context in both *Rivera v. Quarterman*, 505 F.3d 349 (5th Cir. 2007), and *Wiley v. Epps*, 625 F.3d 199 (5th Cir. 2010).  In *Rivera*, we concluded that the CCA's decision that a petitioner had failed to establish a prima facie case of mental retardation and thus could not develop his claim further through a hearing, despite a substantial showing of evidence by petitioner, was an unreasonable application of federal law and left "our review of petitioner's underlying incompetency claim . . . unencumbered by the deference AEDPA normally requires." *Rivera*, 505 F.3d at 358 (citing *Panetti*, 551 U.S. at 947–48).[3]  As we explained, *Panetti* drew on *Ford v. Wainwright*, 477 U.S. 399 (1986), and "[u]nder *Ford*, '[o]nce a prisoner seeking a stay of execution has made a 'substantial threshold showing of insanity,' the protection afforded by procedural due process includes a 'fair hearing' in accord with fundamental fairness.'" *Id.* (quoting *Panetti*, 551 U.S. at 949 (quoting *Ford*, 477 U.S. at 426 (Powell, J., concurring in part and concurring in the judgment))). In *Rivera*, the CCA's failure to provide a prisoner a forum in which to develop his claim after he made such an evidentiary showing constituted an unreasonable

---

[2] In *Panetti*, the Supreme Court relied on its previous decision in *Ford v. Wainwright*, 477 U.S. 399 (1986), in which the Court held that defendants who claim ineligibility for the death penalty because of insanity are entitled to a hearing compliant with due process and fundamental fairness. *See Panetti*, 551 U.S. at 949–50 (citing *Ford*, 477 U.S. at 424–27 (Powell, J., concurring in part and concurring in the judgment)).

[3] A "prima facie case of mental retardation 'is simply a sufficient showing of possible merit to warrant a fuller [exploration] by the district court.'" *Wiley*, 625 F.3d at 213 (quoting *In re Henderson*, 462 F.3d 413, 415 (5th Cir. 2006)) (alteration in original).

application of clearly established federal law and stripped the state court proceedings of AEDPA deference. *Id.* at 357–58, 361.

We again declined to apply AEDPA deference in *Wiley*, a habeas appeal from a Mississippi capital conviction. *Wiley*, 625 F.3d at 213. In that case, a prisoner satisfied the specific state law requirements for a prima facie case of mental retardation under Mississippi law and was therefore entitled to an evidentiary hearing regarding his *Atkins* claim. *Id.* at 206–07 (citing *Chase v. State*, 873 So.2d 1013, 1028–29 (Miss. 2004)). The Mississippi Supreme Court held in *Chase* that "[u]pon receiving [a substantial showing of mental retardation by the petitioner], and any response filed by the State, the trial court shall provide a reasonable amount of time for testing the defendant for mental retardation. Thereafter, the trial court shall set a hearing on the motion, and the matter shall proceed." *Chase*, 873 So.2d at 1029.

In light of this standard, we found that "the Mississippi Supreme Court's decision in Wiley's case to deny a hearing and decide the mental retardation question appear[ed] to be an anomaly" and at odds with its own stated procedures and precedents both prior to and after Wiley's case. *Wiley,* 625 F.3d at 209–11. This inconsistency was a violation of "the core due process concepts of notice and foreseeability . . . . [as] [t]he state court applied an unexpectedly more stringent process to Wiley without notice, contrary to its announced procedure in numerous cases." *Id.* at 211 (citations omitted). Accordingly, we held that the Mississippi Supreme Court unreasonably applied clearly established federal law by not remanding Wiley's petition to the trial court for an evidentiary hearing. *Id.* at 213 (citing *Rivera*, 505 F.3d at 357; *Panetti*, 551 U.S. at 948).

Hines argues that the district court's decision to apply AEDPA deference to the state court's findings is debatable because our holding in *Wiley* necessitated a de novo review of the state court's determinations—i.e., one

devoid of AEDPA deference.  Hines contends that he presented a prima facie case of mental retardation to the state court but was denied a live evidentiary hearing in violation of his due process rights.  To make this point, Hines argues that our decision in *Wiley* did not turn only on Mississippi's specific procedures, but was a broader holding that a state court's failure to provide an *Atkins* hearing after any prima facie showing of mental retardation is a due process violation.

We strongly disagree.  Hines's reading of *Wiley* misapprehends how the Mississippi Supreme Court violated *federal* due process when adjudicating Wiley's *state* habeas claim.  Our decision in *Wiley* was based on the fact that "Wiley presented a prima facie case of mental retardation in his state court habeas application *under the Mississippi standards for an* Atkins *claim*."  *Id.* at 213 (emphasis added).  Indeed, over the course of our opinion, we referred to multiple Mississippi decisions dealing with *Atkins*-related procedures, including the Mississippi Supreme Court's controlling decision in *Chase v. State*, 873 So.2d 1013 (Miss. 2004), which explicitly held that a prima facie showing of mental retardation establishes a prisoner's right to an evidentiary hearing.  *See Wiley*, 625 F.3d at 205–13 (citing *Chase*, 873 So.2d at 1029–30).  Our concern was that by disregarding its holding in *Chase* and "adjudicating Wiley's mental retardation claim without telling him that it would do so [i.e., by not granting an evidentiary hearing after Wiley made out a prima facie case of mental retardation], the state court implicated the core due process concepts of notice and foreseeability."  *Id.* at 211 (internal quotation marks and citation omitted).  Put differently, the Mississippi court's failure to follow its *own* procedures, which it applied in similar cases before and after Wiley's, constituted an "unreasonable application of *federal* law [specifically due process], as a predicate for adjudicating a defendant's claim, [and] undermine[d] the AEDPA deference given to the state court adjudication."  *Id.* at 207 (emphasis added).

No. 11-70010

Hines's situation is not similar to Wiley's because Texas law is different from Mississippi law. Under the Mississippi law at issue in *Wiley*, a prima facie case of mental retardation guaranteed a prisoner a live evidentiary hearing. No such guarantee exists under Texas's *Atkins* procedures. At the habeas stage in Texas courts, *Atkins* claims are governed by the same procedures as other habeas claims and there is no explicit requirement for a live evidentiary hearing. *Ex parte Briseño*, 135 S.W.3d 1, 7–9 (Tex. Crim. App. 2004); *see, e.g.*, *Ex parte Simpson*, 136 S.W.3d 660, 663 (Tex. Crim. App. 2004) (explaining that while "it is advisable to have a[] [live] evidentiary hearing to determine mental-retardation claims raised for the first time in post-*Atkins* habeas applications, it is not necessary where . . . the habeas applicant relies primarily upon trial testimony"); *see also id.* at 663 n.8 ("[D]uring this writ proceeding, both parties could, and did, present whatever additional evidence they believed supported or negated the fact of mental retardation. It was only after consulting with the attorneys that the trial judge determined that a live evidentiary hearing was not necessary."). Thus, while a live evidentiary hearing may be recommended in some *Atkins* cases in Texas, a thorough presentation of evidence at the state habeas proceeding can obviate the need for such a hearing.

The CCA properly explained in reviewing Hines's case that, under Texas law, "[w]hile we have said that the better practice is to conduct a live hearing in cases [such as Hines's], . . . the evidence before the trial court was extensive and we did not specify that a live hearing was necessary when we remanded the case." *Hines*, 2005 WL 3119030 at *1 (citation omitted). Unsurprisingly, Hines can cite no Texas authority to support the proposition that a live evidentiary hearing is required to adjudicate a habeas *Atkins* claim, the key requirement that would be necessary to make his own situation comparable to that of *Wiley*. Indeed, the central problem in *Wiley*—that the Mississippi Supreme Court behaved inconsistently in Wiley's case with respect to its own precedents—is

vitiated in this case because the CCA has specifically labeled *Atkins* hearings as "advisable" measures. *Simpson*, 136 S.W.3d at 663. Accordingly, the decision of the CCA to decide Hines's case on the basis of a paper record does not fall within the ambit of *Wiley*. Thus, the district court's decision to apply AEDPA deference could not be debated among reasonable jurists.

Hines, however, further urges that *Panetti* and *Rivera*, the cases on which we based our decision in *Wiley*, demanded of their own force that the district court review the state court's decision de novo. Again, he is mistaken. The petitioner in *Panetti* made a "substantial threshold showing of insanity," but was denied a constitutionally adequate opportunity to make his insanity case, as required by *Ford*, in state court. *Panetti*, 551 U.S. at 949–50. These *Ford* requirements "include an opportunity to submit 'evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination.'" *Id.* at 950 (quoting *Ford*, 477 U.S. at 427 (Powell, J., opinion concurring in part and concurring in judgment)). However, there is no indication that a *live* hearing, Hines's key complaint with regard to the state court's procedures, is required in an *Atkins* claim as a matter of either federal or state law.[4]

Likewise, *Rivera* cannot support Hines's claim. In that case, the CCA's "finding that Rivera had not made a prima facie showing [of mental retardation] deprived Rivera of the opportunity to develop fully the substance of his claim before the state courts." *Rivera*, 505 F.3d at 357. In light of this, we held that:

> Even though *Atkins* did not specifically mandate any set of procedures, it was decided against the backdrop of the Supreme

---

[4] Even the utility of such hearings was questioned by Justice Powell in the insanity context in *Ford*. See *Ford*, 477 U.S. at 426 ("Th[e] combination of factors [involved in adjudicating insanity] means that ordinary adversarial procedures—complete with live testimony, cross-examination, and oral argument by counsel—are not necessarily the best means of arriving at sound, consistent judgments as to a defendant's sanity.").

Court's and lower court's due process jurisprudence.  The lesson we draw from *Panetti* is that, where a petitioner has made a prima facie showing of retardation as Rivera did, *the state court's failure to provide him with the opportunity to develop his claim deprives the state court's decision of the deference normally due.*

*Id.* at 358 (emphasis added and footnote omitted).  In contrast, here there is no indication that the absence of a live hearing at the state court prevented Hines from developing his mental retardation claim.  To the contrary, Hines has had ample opportunities to develop this claim.  Therefore, neither *Panetti* nor *Rivera* provide grounds for debating the district court's conclusion.

Our foregoing analysis reveals that reasonable jurists could not debate the district court's decision to apply AEDPA deference.  Texas state law recommends but does not require the use of a live hearing in cases such as Hines's, in which a substantial evidentiary record suffices to present a mental retardation claim.  Nor was Hines denied an opportunity to develop his claim throughout the course of the state proceedings.  Accordingly, we hold that reasonable jurists could not disagree with the district court's application of AEDPA deference to the state court's findings and conclusions in Hines's case.

## C.     Hines's *Atkins* Claim

Having determined that reasonable jurists could not debate the district court's application of AEDPA deference to the state court's factual determinations, we now turn to a "threshold inquiry into the underlying merit of [Hines's *Atkins*] claim[]" to determine whether he is entitled to a COA.  *Miller-El*, 537 U.S. at 327.  We look to see if "jurists of reason could disagree with the district court's resolution of [Hines's] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Id.*  Whether Hines is mentally retarded is a question of fact, reviewed under 28 U.S.C. § 2254(d)(2).  *Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006); *see also  Maldonado v. Thaler*, 625 F.3d 229, 236 (5th Cir. 2010).  Under

No. 11-70010

§ 2254(d)(2), a federal district court may grant habeas relief "only if the state court's adjudication of his claim on the merits . . . 'resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Rabe*, 649 F.3d at 308 (quoting 28 U.S.C. § 2254(d)).[5]

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court held that the execution of the mentally retarded violates the Eighth Amendment as a cruel and unusual punishment. *Id.* at 320–21. However, in its opinion, the Supreme Court did not offer a specific definition for "mental retardation," instead opting to refer to two medical definitions of mental retardation, one from the American Association on Mental Retardation ("AAMR")[6] and another from the American

[5] We also note that under AEDPA "a determination of a factual issue made by a State court shall be presumed to be correct," such that "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The relationship between this provision and § 2254(d)(2) is ambiguous. As this court has previously explained, "[w]e do not make any pronouncements as to whether the more deferential standard prescribed in § 2254(e)(1) applies in every case presenting a challenge under § 2254(d)(2)," a question that the Supreme Court has left open. *See Turner v. Epps*, 412 F. App'x 696, 700 n.2 (5th Cir. 2011) (citing *Wood v. Allen*, 130 S. Ct. 841, 848–49 (2010) (observing, but not resolving, the circuit split among courts regarding the relationship between § 2254(d)(2) and § 2254(e)(1))). Below, we hold that reasonable jurists could not debate the correctness of the district court's determination that the state court's adjudication was not based on an unreasonable determination of the facts. Therefore, we see no need to resolve which standard—the more rigorous "clear and convincing" or the more lenient "unreasonable determination"—should govern this case and do not consider this issue further.

[6] The AAMR defines mental retardation as the following:

Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.

AMERICAN ASSOCIATION ON MENTAL RETARDATION, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992).

In 2002, the AAMR modified its definition accordingly:

Mental retardation is a disability characterized by significant limitations both

13

No. 11-70010

Psychiatric Association ("APA").[7] The Court highlighted three relevant elements from these clinical definitions: "[M]ental retardation require[s] not only [1] subaverage intellectual functioning, but also [2] significant limitations in adaptive skills such as communication, self-care, and self-direction that [3] became manifest before age 18." *Id.* at 318. The Court left ""to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" *Id.* at 317 (quoting *Ford*, 477 U.S. 399 at 405, 416–17) (alteration in original).

Thus, in determining whether Hines merits a COA, we look to Texas's law regarding mental retardation. In Texas, the state legislature has failed to provide a statutory definition for what qualifies as mental retardation in the wake of *Atkins*, resulting in the CCA's crafting of these standards. *See Neal v. State*, 256 S.W.3d 264, 271–72 (Tex. Crim. App. 2008); *see also Briseño*, 135 S.W.3d at 5–13 (establishing a definition of mental retardation under *Atkins*).

The CCA defined mental retardation in *Briseno* as "a disability characterized by: (1) 'significantly subaverage' general intellectual functioning; (2) accompanied by 'related' limitations in adaptive functioning; (3) the onset of

---

in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

AMERICAN ASSOCIATION ON MENTAL RETARDATION, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 1 (10th ed. 2002).

[7] The APA defines mental retardation somewhat similarly:

The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C).

AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th ed.2000). This definition is often referred to as the DSM-IV-TR definition.

14

which occurs prior to the age of 18." *Briseno*, 135 S.W.3d at 7 (footnotes omitted).[8] Importantly, this definition draws on the standard provided for in the Texas Persons with Mental Retardation Act, which requires that mental retardation originate during a person's "developmental period," prior to their eighteenth birthday. TEX. HEALTH & SAFETY CODE § 591.003(13) ("'Mental retardation' means significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period."). "Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below (approximately 2 standard deviations below the mean)." *Briseno*, 135 S.W.3d at 7 n.24 (citation omitted).[9] "Impairments in adaptive behavior are defined as significant limitations in an individual's effectiveness in meeting the standards of maturation, learning, personal independence, and/or social responsibility that are expected for his or her age level and cultural group, as determined by clinical assessment and, usually, standardized scales." *Id.* at 7 n.25 (citation omitted).[10] A defendant who seeks to invoke the affirmative defense of mental retardation bears the burden

---

[8] More specifically, the CCA adopted the AAMR definition of mental retardation, as well as the definition laid out in Texas Health and Safety Code § 591.003(13). *See Briseno*, 135 S.W.3d at 7.

[9] This is not an inflexible numerical standard, however: "Psychologists and other mental health professionals are flexible in their assessment of mental retardation; thus, sometimes a person whose IQ has tested above 70 may be diagnosed as mentally retarded while a person whose IQ tests below 70 may not be mentally retarded." *Briseno*, 135 S.W.3d at 7 n.24. The Texas Health and Safety Code has further explained, "'[s]ubaverage general intellectual functioning' refers to measured intelligence on standardized psychometric instruments of two or more standard deviations below the age-group mean for the tests used." TEX. HEALTH & SAFETY CODE § 591.003(20).

[10] Given that "[t]he adaptive behavior criteria are exceedingly subjective, and undoubtedly experts will be found to offer opinions on both sides," the CCA paired this definition with a list of "evidentiary factors" relevant in identifying a limitation in adaptive functioning. *Briseno*, 135 S.W.3d at 8–9. We discuss these in greater depth below.

of showing that he is mentally retarded by a preponderance of the evidence. *Neal*, 256 S.W.3d at 273.

Hines makes several arguments generally asserting that a preponderance of the evidence presented to the state court showed that he meets the Texas criteria for mental retardation.[11]    First, Hines argues that there was a preponderance of the evidence showing that he had subaverage intellectual function before the age of eighteen, including the testimony of his second grade teacher, evidence that I.Q. tests administered to him prior to the age of eighteen were invalid and unreliable measures of intelligence, and expert testimony that on later exams after the age of eighteen Hines was not malingering and gave full effort.   Second, Hines also contends that there was a preponderance of the evidence that he had adaptive deficits before the age of eighteen, including testimony from family members about Hines's behavioral and learning deficits, as well as evidence that Hines was mostly in special education as a child.  We parse the district court's review of the evidence presented to the state court in order to ascertain if reasonable jurists could debate the district court's conclusion: Namely, that the state court's rejection of Hines's *Atkins* claim was not an unreasonable determination of the facts in light of the evidence before it.

i.    *Significantly Subaverage General Intellectual Functioning*

Hines initially presented several pieces of evidence in making his *Atkins* claim before the state court: "(1) a handful of records from the Texas Youth Commission (TYC), Child Protective Services (CPS), and Paris Independent School District (PISD), affidavits from three family members, a former school counselor, and a former teacher, (3) and the report of Dr. Wesley E. Profit, Ph.D.,

---

[11] Hines also argues that the district court, despite its statements to the contrary, failed to engage in the de novo review it claims to have carried out when reviewing his Rule 59(e) motion and instead deferred to the state court's findings.  Since we conclude that AEDPA deference was due to the state court's findings, we reject his contention.

No. 11-70010

J.D." *Ex parte Bobby Lee Hines*, No. W91-21511-I(B), at 4, ¶ 9 (June 23, 2005). These were later supplemented with the affidavit of a co-worker and a report from another expert, Gilda Kessner, Psy.D., who Hines hired to personally evaluate him   *Id.* at 4, ¶ 9–10.[12]   The district court also considered six documented I.Q. scores:[13]

|   | I.Q. Test | Given By | Date | Hines's Age | Score |
|---|-----------|----------|------|-------------|-------|
| 1 | Otis-Lennon Mental Ability Test | PISD | 1978 | 6 years | 68 |
| 2 | Otis-Lennon Mental Ability Test | PISC | 1980 | 7 years | 73 |
| 3 | WISC-R (Wechsler Intelligence Scale for Children – Revised) | TYC Diagnostician | 1986 | 13 years | Verbal – 82 Performance – 112 Full Scale – 96 |
| 4 | TONI (Test of Non-Verbal Intelligence) | TYC Diagnostician | 1989 | 16 years | 87 |
| 5 | Beta-II (or Culture Fair Intelligence Test) | TDCJ Diagnostician | 1990 | 17 or 18 years | 97 |
| 6 | WAIS-III (Wechsler Adult Intelligence Scale) | Defense Psychologist | 2004 | 31 years | Verbal – 69 Performance – 75 Full Scale – 69 |

The state court discounted the evidentiary value of the first two I.Q. tests, the Otis-Lennon tests from 1978 and 1980.  The court found that Otis-Lennon is a "brief, group-administered, verbal IQ test" used as "screening tool, not a tool for diagnosing mental retardation." *Id.* at 7, ¶ 24.  Children from impoverished

---

[12] The state court found that both Drs. Profit and Kessner relied on additional documents that were not submitted to either it or the CCA.  *Hines*, No. W91-21511-I(B), at 4, ¶ 11.  The state court found that these documents contained "significant information refuting [Hines]'s retardation claim," including the evaluation of two TYC psychologists who concluded that Hines is not mentally retarded.  *Id.* at 4–5, ¶ 12.

[13] Other I.Q. scores were apparently destroyed along with other records over the course of Hines's education.

17

backgrounds with dysfunctional home lives, like Hines, tend to perform worse on such tests, depressing the scores. *Id.* at 8–9, ¶ 27–28. The state court found that more weight should be placed on "individually administered tests, [where] the administrator focuses attention on the test-taker." *Id.* at 8 ¶ 26.

The only other test score in the record before the state court supporting Hines's *Atkins* claim was the WAIS-III carried out by Dr. Kessner in 2004. While this is an individually administered test and "well-regarded," *id.* at 11, ¶ 39, the state court found several problems with this test as well. First, the administration of the test occurred within one month of Hines's consultation with Dr. Price, potentially resulting in a "practice effect" phenomenon. *Id.* at 11, ¶ 42. More problematically, however, the test was administered to Hines at age thirty-one, making it a poor measure of whether he was mentally retarded during his developmental period, a key requirement for finding mental retardation under *Briseno*. *Id.* at 12, ¶ 43; *see also Briseno*, 135 S.W.3d. at 6–7. Third, while there was conflicting evidence as to whether Hines malingered on the test, the state court did not find Hines's proffered evidence sufficient to show that he did not malinger given his strong incentive to do so. *Hines*, No. W91-21511-I(B), at 12–13, ¶ 44–51. Finally, Hines's score of 69 was consistent with a score as low as 64, as well as one as high as 74, with the higher-end score being above the I.Q. line for mild mental retardation. *Id.* at 13, ¶ 52.[14]

Consequently, the state court found that the WISC-R score of 96, taken when Hines was thirteen in 1986, was the most persuasive evidence regarding his alleged mental retardation. *Id.* at 15, ¶ 59. As an individually administered and respected test taken by Hines during his developmental period, the WISC-R

---

[14] The state court also observed that any deficiencies identified by the WAIS-III result may have been due to "chronic substance abuse" and "an acquired organic brain dysfunction" on the part of Hines, rather than mental retardation. *Hines*, No. W91-21511-I(B), at 14–15, ¶ 53–56.

score provided credible evidence that "[Hines]'s intellect [was] in the borderline to average range." *Id.* at 15, ¶ 61. The state court rejected Hines's arguments that the test was improperly administered, that a practice effect boosted the score, or that the WISC-R was an outdated test. The court observed that while the raw data were not available for the test, the availability of individual component scores, as well as the fact that all the individuals who were involved in the administration of the test appeared qualified to administer it, refuted the possibility that it was wrongly administered to Hines. *Id.* at 16–17, ¶ 65. The court also found that it was unlikely that Hines had been tested in the six months prior to taking the WISC-R, resulting in a practice effect that would boost the score, given that state law requires I.Q. testing only every three years. *Id.* at 17, ¶ 66. Moreover, even the boost provided by a practice effect would not have been sufficient to raise questions about whether Hines was actually mentally retarded. *Id.* at 17–18, ¶ 68. The court also found that the evidence of score inflation due to the WISC-R being outdated was mixed, *id.* at 18, ¶ 71, but that in any event, this inflation would only have been around 3.6 points, leaving Hines's score "well within the range of borderline to average intelligence." *Id.* at 18–19, ¶ 70–73. Lastly, the court found that any disparities among the various components of the WISC-R were likely due to the fact that Hines had a learning disability, something established by both TYC and PISD. *Id.* at 19–20, ¶ 74–78. In sum, the court explained, "[a]lthough any number of factors could account for [Hines]'s poor performances on the Otis Lennon and WAIS-III tests, . . . there [could] be only one explanation for his elevated performance on the WISC-R—[Hines] possesses an intellect in the average range." *Id.* at 22, ¶ 86.

The state court also noted that while the TONI and Beta II tests were normally group administered, *id.* at 21, ¶ 82, it was likely that the TONI test was individually administered to Hines. *Id.* Observing that the "TONI [test] is

at least as accepted as the Otis-Lennon test," *id.* at 21, ¶ 83, the court found that these tests were sufficient to lend further confidence to the results of the WISC-R test. *Id.* at 20, ¶ 79. Thus, the state court concluded that Hines had failed to prove by a preponderance of the evidence that he met the first *Briseno* prong. *Id.* at 22, ¶ 88.

The magistrate judge reviewed the state court's determination, including the evidence provided by Hines. *Hines*, No. 3:06-cv-00320-G, Findings and Recommendation, at 3. In concluding that Hines failed to manifest significantly subaverage general intellectual functioning during his developmental period, the magistrate judge, following the state court, placed particular emphasis on the results of the WISC-R test that Hines took when he was thirteen in 1986. *Id.* at 7. The district court also adopted this view, observing that I.Q. tests taken during a petitioner's childhood may be given more weight than those conducted in the shadow of habeas litigation. *See Hines*, No. 3:06-cv-00320-G, Order, at 9–10; *see, e.g.*, *Moore v. Quarterman*, 517 F.3d 781, 784 (5th Cir. 2008) (denying COA under AEDPA deference and explaining that "[w]hile these [I.Q. test] scores [of 68, 72, 72, 76, 63, and 76] could support a finding of subaverage intellectual functioning, the scores can also sustain a finding that [petitioner] is not retarded").

Hines attempted to counter this emphasis on the 1986 WISC-R test's results by arguing that these results were unreliable and that later test results, administered well into his conviction and post-conviction litigations in April 2004 and 2009, demonstrate that he is retarded. *See Hines*, No. 3:06-cv-00320-G, Order, at 11–12 (reporting April 2004 score of 69 on WAIS-III test and April 2009 scores of 70 on a WAIS-IV test and 71 on a Reynolds test).

However, as the district court correctly observed, the deferential standard of AEDPA presumes that state court determinations of fact are correct, rebuttable only with "clear and convincing evidence," 28 U.S.C. § 2254(e)(1), and

that such factual determinations must be "unreasonable," 28 U.S.C. § 2254(d)(2). In this case, the other evidence presented before the state court buttressed the validity of the WISC-R test. First, Hines's WISC-R score was consistent with other I.Q. test results, including a score of 87 on the TONI test taken in 1989 when Hines was sixteen and a score of 97 on the Beta-II Test taken in 1990 when Hines was either seventeen or eighteen. Second, Hines was able to secure a GED at the age of 17, an indicator of some general intellectual capacity.[15] Third, the state court, which only had before it the WAIS-III result of 69 from April 2004, could reasonably determine that Hines did not put forth his best effort on this test, despite conflicting evidence on this issue. *See Moore*, 517 F.3d at 784 (denying COA because a state court's finding that a petitioner is not mentally retarded is not rendered unreasonable simply because "there was conflicting expert evidence" and a range of I.Q. scores). Finally, as the state court noted, the WAIS-III result of 69 was not itself determinative of mental retardation because it could indicate that Hines's I.Q. reached as high as 74, outside the range of scores required for a finding of mental retardation under *Briseno*.[16] *See Taylor v. Quarterman*, 498 F.3d 306, 307–08 (5th Cir. 2007) (denying COA where petitioner had received I.Q. test scores of 75, 63, 69, 65, and 71); *see also Ex parte Woods*, 296 S.W.3d 587, 608 (Tex. Crim. App. 2009) ("Even

---

[15] Hines attempted to argue that his GED was procured with the illegitimate aid of a test administrator, *Hines*, No. W91-21511-I(B), at 35–37, ¶ 147–58, but the state court found no persuasive evidence to support this claim. *See id.*

[16] We also observe that even if the state court record were supplemented by the hearing before the federal magistrate judge, it still would not support Hines's *Atkins* claim. The later I.Q. tests submitted by Hines suggesting that he is mentally retarded (April 2009 scores of 70 on a WAIS-IV test and 71 on a Reynolds test), still suffered from the same fundamental defects as the WAIS-III test. Namely, they begged the question of whether Hines malingered. While Hines was able to present more evidence at the federal hearing that he did not malinger on these more recent tests, this was insufficient to persuade either the magistrate judge or the district court. Moreover, as we will discuss below, these newer tests cannot show that Hines manifested mental retardation during his developmental period, a necessary component of the *Briseno* definition.

## No. 11-70010

[assuming an I.Q. score range from 63 to 78], a rational trier of fact could find that applicant's Full Scale IQ falls above 70.").

Given the strength of these evidentiary findings, we hold that reasonable jurists could not debate the district court's conclusion that the state court's determination that Hines failed to meet the first *Briseno* prong was not an unreasonable determination of the facts in light of the evidence before it.

*ii.     Related Limitations in Adaptive Functioning*

While a failure on the first *Briseno* prong would be sufficient to end Hines's *Atkins* claim, both the state and district courts also rejected the contention that Hines suffered from deficits in his adaptive functioning due to mental retardation—the second *Briseno* prong.   In a thorough analysis, the state court evaluated all of the evidence provided by both Hines and the State in light of the seven "evidentiary factors" given in *Briseno*:

> • Did those who knew the person best during the developmental stage—his family, friends, teachers, employers, authorities—think he was mentally retarded at that time, and, if so, act in accordance with that determination?
>
> • Has the person formulated plans and carried them through or is his conduct impulsive?
>
> • Does his conduct show leadership or does it show that he is led around by others?
>
> • Is his conduct in response to external stimuli rational and appropriate, regardless of whether it is socially acceptable?
>
> • Does he respond coherently, rationally, and on point to oral or written questions or do his responses wander from subject to subject?
>
> • Can the person hide facts or lie effectively in his own or others' interests?
>
> • Putting aside any heinousness or gruesomeness surrounding the capital offense, did the commission of that offense require forethought, planning, and complex execution of purpose?

No. 11-70010

*Briseno*, 135 S.W.3d at 8–9.

The state court initially observed that both Drs. Profit and Kessner opined that Hines suffered from sufficient deficits in his adaptive skills to require a finding of mental retardation. *Hines*, No. W91-21511-I(B), at 23, ¶ 91. However, Dr. Jack Randall Price, Ph.D., an expert retained by the State who personally interviewed Hines and assessed all relevant records, *id.* at 5, ¶ 16, disagreed with their conclusions and opined that Hines's adaptive behaviors were inconsistent with those of a retarded person. *Id.* at 23, ¶ 92. The state court credited "Dr. Price's personal and more thorough evaluation of [Hines] and the pertinent records," *id.* at 25, ¶ 101, observing that Dr. Profit never actually interviewed Hines and that Dr. Kessner's opinions were based "entirely on the results of her own, recent testing of him." *Id.* at 24, ¶ 94–96, 98.

The state court also examined the evidence produced by Hines, as well as countervailing evidence offered by the State, on each of the evidentiary factors. Regarding the first factor—whether others regarded and treated Hines as mentally retarded—Hines submitted affidavits from family, friends, and co-workers of Hines alleging that he was a "slow learner, slow to develop, gullible, and a concrete thinker." *Id.* at 26–27, ¶ 106. The court determined that these affidavits lacked credibility because prior to Hines's death sentence, none of the individuals appeared to regard Hines as mentally retarded or treat him as such. *Id.* at 27, ¶ 109. Indeed, testimony at Hines's murder trial by these same individuals contradicted Hines's claim of mental retardation, revealing, for example, that Hines was "a very good employee . . . . [who] had no problems doing what he was asked to do . . . ." *Id.* at 27, ¶ 111.[17] Affidavits offered by Karol Asay, Hines's second or third grade teacher, and Rachel Braswell, his school's counselor from third to fifth grades, were based either on a limited recall

---

[17] The state court similarly rejected the probative value of affidavits from other death row inmates. *Hines*, No. W91-21511-I(B), at 28–29, ¶ 113–18.

of encounters with Hines, *id.* at 29, ¶ 122–23, or contradicted by school records which failed to demonstrate that Hines was actually retarded, instead describing him as "learning disabled and emotionally disturbed." *Id.* at 30, ¶ 125. Affidavits from other educators and school officials further indicated that Hines was never diagnosed and never regarded as mentally retarded. *Id.* at 31, ¶129–32. This was further corroborated, the court found, by Hines's encounters with the police, CPS, juvenile probation, and TYC. Affidavits and records from these various organizations revealed no indication that Hines was diagnosed as mentally retarded or ever regarded as such, instead noting that while Hines may not have been bright, he was capable of attaining average grades at school and seeking out help when necessary. *See id.* at 31–34, ¶ 133–44. Together this evidence indicated, the trial court found, that Hines was not regarded as mentally retarded by others.

The state court also found that the second, third, fourth, and fifth *Briseno* evidentiary factors did not indicate that Hines had deficits in adaptive functioning. For the second factor—whether Hines could develop and carry out plans—the state court found that the record revealed that Hines was capable of formulating and executing various plans, including seeking out the authorities to prevent his father's abuse, planning and carrying out crimes, and escaping punishment while on probation. *Id.* at 37–38, ¶ 163–67. This was coupled with evidence on the third factor—whether Hines showed leadership—demonstrating that Hines was not "led around by others," including the affidavits of CPS caseworkers and teachers averring that Hines was capable of manipulation and leading others, as well as acting on his own to protect himself. *Id.* at 38–42, ¶168–90. On the fourth factor—whether Hines's conduct was "rational and appropriate" regardless of whether it was socially acceptable—the state court found that the record also demonstrated that Hines had "an aptitude for judging and responding to people and events," showing some capacity to react rationally

to the chaotic events of his childhood. *Id.* at 43–44, ¶ 191–200. The fifth factor—whether Hines could respond coherently, rationally, and on point to questions—also indicated to the state court that Hines is not mentally retarded, as there was evidence that Hines was able to respond to questions from both investigators and journalists and produce coherent pieces of writing. *Id.* at 44–48, ¶ 201–17.

The state court also found that the last two factors further militated against finding Hines mentally retarded. For the sixth factor—dealing with whether Hines could hide facts or lie in his own interest—the state court found that there was broad and consistent evidence that Hines lied frequently and well when his self-interest demanded it. *Id.* at 48–49, ¶ 218–24. The state court further observed that Hines had not confessed to the murder and had, in fact, resisted custodial interrogation about it, in contrast to other mentally retarded offenders who inadvertently admit their crimes. *Id.* at 49 ¶ 225. Indeed, in a typewritten letter dated February 20, 2005, Hines joked about his mental retardation defense, writing "WELL WAIT A DAMN MINUTE I'm a returd remember, can't blame me . . . . . (smile)." *Id.* at 49–50, ¶ 226 (errors in original). These findings dovetail with those probative of the seventh factor—whether the commission of the offense required forethought, planning, and complex execution. The nighttime entry to catch his victim unaware and vulnerable, the obtaining of a key in advance, the taking of a weapon, and the careful eluding of the police in the wake of the murder all signaled to the state court that "Hines['s] conduct showed that he contemplated, designed and improvised the attack on Ms. Haupt with a degree of skill absent in those of lesser intellect." *Id.* at 50–52, ¶ 233, 236.

These substantial findings indicated to the state court that Hines suffered no deficits in adaptive functioning and thus did not meet the second prong of the *Briseno* definition. *Id.* at 54, ¶ 246. The magistrate judge accepted the findings

of the state court with relatively little comment, other than to note that "[n]o new evidence regarding [Hines]'s adaptive functioning was presented to this court at the evidentiary hearing based on his federal writ." *Hines*, No. 3:06-cv-00320-G, Findings and Recommendation, at 12. The district court, in accepting the magistrate judge's findings, observed that the depth and detail of the state court's findings, as well as the importance of leaving credibility determinations to the trial court, made clear that Hines did not meet the second *Briseno* prong. *Hines*, No. 3:06-cv-00320-G, Order, at 15–17.

We agree. There is no indication in the record that the state court's determinations of fact were unreasonable. Reasonable jurists could not debate whether the district court was correct in accepting the state court's determinations.

### 3. *Onset Before Age 18*

The final *Briseno* prong is that mental retardation must manifest during the petitioner's developmental period. *Briseno*, 135 S.W.3d. at 7. The state trial court found that "any deficiency [on Hines's part] did not commence during applicant's developmental period, i.e., before the age of 18," *Hines*, No. W91-21511-I(B), at 54, ¶ 249, based on its findings regarding the other two *Briseno* prongs. The magistrate judge said relatively little on this issue, instead concluding that "[Hines] ha[d] failed to adduce any evidence . . . that would shed new light on the *Briseno* factors. . . . [leaving] no basis for disturbing the state court's determination that [Hines] has no corresponding limitations in adaptive functioning or that any purported deficiency commenced during the developmental period." *Hines*, No. 3:06-cv-00320-G, Findings and Recommendation, at 13. The district court added little to this determination. *Hines*, No. 3:06-cv-00320-G, Order, at 14.

Again, we see no unreasonable determination on the part of the state court in finding that Hines did not manifest mental retardation before the age of

eighteen.  Consequently, Hines has failed to show that reasonable jurists would disagree with the district court's conclusion that state court's findings were not unreasonable determinations of fact.

## III. CONCLUSION

Hines has failed to persuade any court, federal or state, of his *Atkins* claim, and has failed to make a showing sufficient to merit a COA.  The state court's determination was properly subject to AEDPA deference, and Hines has failed to show that reasonable jurists could debate whether the district court's rejection of his *Atkins* claim was correct.  Accordingly, we DENY Hines's request for a COA.